**Mary L. HARRISON, Plaintiff,**

**v.**

**The Honorable John O. MARSH, Secretary of the United States Army, Defendant.**

**No. 85–3464–CV–S–2.**

United States District Court, W.D. Missouri, S.D.

March 25, 1988.

Donald W. Jones, Springfield, Mo., (court appointed), for plaintiff.

Robin J. Aiken, Asst. U.S. Atty., Springfield, Mo., for defendant.

## MEMORANDUM OPINION

COLLINSON, Senior District Judge.

The plaintiff, Mary L. Harrison, instituted this action against the defendant, John O. Marsh, Jr., Secretary of the Army, on September 25, 1985 by applying to this Court for leave to proceed in forma pauperis. After this Court initially denied her leave, plaintiff paid her filing fee and filed her complaint pro se on September 30, 1985. Following plaintiff's motion and upon reviewing additional information provided to the Court, the order denying leave was vacated November 5, 1985 and it was ordered that plaintiff's filing fee be refunded. In that same order, Mr. Donald W. Jones was directed to represent plaintiff in this case on a *pro bono publico* basis. Mr. Jones filed an amended complaint on December 13, 1985 on behalf of plaintiff in which it was alleged that the defendant has "failed to accommodate plaintiff's handicapped condition as required by law," more specifically, the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* (Act) Plaintiff further alleges that defendant retailiated against her because of her efforts to assert her rights under the law.

### I

Plaintiff is currently, and at all times material herein has been, a civilian employee of the Department of the Army of the United States at Fort Leonard Wood, Missouri. She has for many years been employed there as a GS–3 clerk/typist and was employed there as such on at least one prior occasion.

Mrs. Harrison was first employed at the Fort from 1950 to 1956 as a pay/supply clerk. This position carried a GS–3 rating. After returning to work at the Fort for a few months on a temporary basis in 1972, Mrs. Harrison resumed work as a permanent employee on approximately February 5, 1974. She has worked there continuously since that time.

Over that fourteen-year period, Mrs. Harrison has held the following positions at the Fort:

(a) Secretary and Legal Clerk at the personnel control facility.

(b) Secretary in engineering control facility.

(c) Secretary in the office of the post engineers.

(d) Casualty clerk at the Adjutant General's office.

(e) Military personnel clerk in the records section of Adjutant General.

(f) Her present position as a clerk-typist at the drug and alcohol treatment center.

All of the positions carried a GS-3 rating and all involved varying amounts of typing and filing.

As a treatment for cancer, Mrs. Harrison was required to have a radical mastectomy operation performed on her left breast on May 13, 1977. Pursuant to the surgical treatment, in addition to the left breast, significant portions of the muscles in plaintiff's left arm, shoulder, and chest under the arm-shoulder area were required to be removed.

Following the initial recuperative period, Mrs. Harrison resumed her duties at work. Although she encountered very few physical problems at first, her work gradually became more and more painful to her. The degree to which she suffered pain and fatigue seemed to vary in proportion to the amount of continuous typing that was required of her. Though the medical evidence is inconclusive in spots, a fair inference from the evidence is that it was the surgery that eventually made it difficult and burdensome for plaintiff to type over prolonged or continuous periods of time.

In the years immediately subsequent to her surgery, Mrs. Harrison's immediate supervisors were cognizant of her situation and made limited attempts to allow for it.

However, after Grant D. Batchelder became Supervisory Military Personnel Clerk and Joe L. Howell became Chief of Personnel Records Section, both in supervisory capacities over plaintiff's employment, in approximately May or June of 1983, her working relationship with her supervisors, and her treatment at their hands, began to change. These supervisors regularly assigned Mrs. Harrison to heavy typing duties over continuous, prolonged periods of time. Though there is evidence to suggest that friction existed between Mrs. Harrison and her supervisors for reasons other than her physical condition, it nevertheless appears that from the spring of 1983 forward, Mrs. Harrison's physical ailment increased in degree as did her need for special consideration from her supervisors. Instead, the lack of consideration caused her work to grow more burdensome and its effect on her constitution more taxing.

The most telling example of this conduct was the requirement that Mrs. Harrison work on the "beltline." As near as the Court can determine, working on the beltline is something akin to working in an emergency typing pool.[1] In years previous to 1983, when Mr. Rick Rowe was Mrs. Harrison's supervisor, she had typed at the beltline as a relief typist, but had never been order to do continuous typing. However, in September of 1983, Mrs. Harrison was in fact required to do just that.[2]

---

1. Beltline, more formally known as the Emergency Development Readiness Exercise (EDRE), is an unannounced alert-type drill in which deployable combat-type units are readied to move overseas into a combat situation. During the exercises, the service members go through records checks to determine if their financial, medical and legal affairs are in order. Mrs. Harrison was one of several employees who serviced members of the deploying units. The employees are responsible for verification of identification (ID) tags, ID cards and the useability thereof. They also update service members' records of emergency data and insurance forms as needed during the exercise.

2. Plaintiff reasoned, and this Court concurs, that typing on the beltline differed from her regular typing responsibilities in at least three respects. First, and most important, a large number of military personnel must be processed in relatively short order. This required that she type continuously for one to four hours without a break. Doing her normal duties, on the other hand, allowed her the opportunity to occasionally drop her arms and move around for a few minutes to relieve the tired feeling in her arms. Two, she normally had a typing chair but, when working on the beltline, had to sit on a folding chair while typing. The folding chair provided little or no back support. Three,

On September 13th, Mrs. Harrison, while assigned to the beltline in Building 282, fainted as a result of muscle cramps in her arm. She had begun work at 8:00 a.m. and was observed two to three hours later slumped down and sideways to the right of the chair in which she was sitting. In the resulting fall, she had received bruises to her face and body and was evacuated to the General Leonard Wood Army Community Hospital by ambulance. After receiving treatment, she was released from the hospital by Dr. L.G. Myers of Richland, Missouri.

Satisfied that she should be deemed handicapped under the law and that any steps taken by the Army to accommodate her had been, and would continue to be, inadequate and unsatisfactory, Mrs. Harrison filed shortly thereafter a timely complaint under 29 C.F.R. 1613. The complaint alleged that she had been unlawfully discriminated against by the conduct of Batchelder and Howell and others acting in concert with them, in failing to accommodate plaintiff's handicapped condition.

This resulted in an investigation and a decision which was issued by the St. Louis Office of the United States Army Civilian Appellate Review Agency on May 18, 1984, finding plaintiff's complaint to be meritorious. The investigator[3] found that Mrs. Harrison was handicapped within the meaning of the law and that the Army was guilty of discrimination due to its failure to accommodate her impairment. Further, the investigator recommended plaintiff be reassigned and/or her job restructured so as to eliminate the requirement that she perform typing duties over continuous or prolonged periods of time, all as required accommodation pursuant to 29 C.F.R. 1613.704.

In response to the EEO investigator's report, a meeting was held on June 13, 1984 to determine what must be done to comply with the investigator's suggestions. The meeting was presided over by an offi-cer of the EEO, Mr. James Redel, and was also attended by Mr. Howe and Mr. Batchelder and representatives of the Adjutant General, Civilian Personnel Office, and the Judge Advocacy staff. Mrs. Harrison was also allowed to attend a portion of the meeting.

While Mrs. Harrison was there, she was told by the Civilian Personnel Officer[4] that, in order to comply with the recommended decision of the investigator, the defendant was merely required to offer her one job and one job only. Furthermore, Mrs. Harrison was told that she had no right to interview for the job and that she must either "take or leave" the one job offer they would make her.

The "one job offered" by the government following the June 13th meeting, which Mrs. Harrison accepted, is the same clerk-typist position that she held at the time this suit was filed. During trial, plaintiff offered evidence, not seriously disputed by the government, that the plaintiff's work at the new position has been even more physically demanding than her previous duties. She is the only receptionist for six to eight people and does a significant portion of their typing assignments. In fact, perhaps 70% or more of her time involves typing duties of a continuous nature. Furthermore, plaintiff is not only required to carry out all the directions of Mr. David Licklider, her normal supervisor, but is also required to do work for her second line supervisor, a Mr. Terezza, who works in another building entirely. Mr. Licklider brings the work from Mr. Terezza to the plaintiff and thereby assigns her work that is over and beyond that covered by her job assignment. All in all, the assignments given the plaintiff to perform in her new position have done nothing to accommodate her physical condition and have, in fact, quite possibly aggravated it.

During her current job assignment, the plaintiff was required to be taken by emergency ambulance to the Fort Leonard

typing off of a field table on the beltline, she had to sit at a different angle than she normally would when typing.

3. Mrs. Jonell Y. Calloway, Investigator, USACARA, Midwest Region.

4. Mrs. D. Virginia Thompson.

Wood Hospital on December 3, 1986, due to chest pains experienced while at work and brought about by the stress and muscle cramps which plaintiff experienced during her job.

The plaintiff and defendant jointly agreed upon a written request to have plaintiff evaluated by a medical doctor at Fort Leonard Wood Hospital. As a result of that joint request, the plaintiff was evaluated by Mark G. Newbrough, M.D. on November 16, 1986. Dr. Newbrough's diagnosis following his examination of the plaintiff included the following findings:

> Two of the major muscles to the left arm were sacrificed curing her Cancer. It is, therefore, feasible that she does have a disability of the left arm.... She should be able to type, however, *she may require extended rest periods.* (Emphasis added).

Dr. Newbrough is Chief, General Surgery Service at the Fort Leonard Wood Hospital.

## II

This case involves the construction and interpretation of Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791, and appurtenant regulations. The Act was initially intended primarily to help states develop and implement vocational rehabilitation services for handicapped persons. It was later amended to provide more comprehensive protection for handicapped persons subjected to discriminatory treatment.

Section 501 of the Act in its original form required federal agencies to adopt affirmative action plans for employment of the handicapped, but it contained no private right of action. "In 1978 Congress added such a right by enacting section 505(a)1, 29 U.S.C. § 794a(a)1, which provided that the rights and remedies available under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–16, were available to a person complaining of discrimination in violation of Section 501." *Boyd v. United States Postal Service,* 752 F.2d 410, 412 (9th Cir.1985). One effect of this incorporation was that the requirement of exhaustion of administrative remedies applicable to federal employees under Title VII (*See Brown v. General Services Administration,* 425 U.S. 820, 832, 96 S.Ct. 1961, 1967, 48 L.Ed.2d 402 (1976)) was imported into claims brought under Section 501. That requirement has been met in the instant case.

Most of the cases in the area of handicap discrimination involve the interpretation of Section 504 of the Act, 29 U.S.C. § 794, which prohibits the exclusion, "solely by reason of their handicap" of "otherwise qualified individuals" from government agencies or programs receiving federal funds.[5] In its original form, the primary thrust of Section 504 was therefore to reach and prohibit discrimination by non-governmental agencies receiving federal funds. However, amendments enacted in 1978, in addition to expanding covered activities to include "any program or activity conducted by an Executive agency or by the United States Postal Service," added a provision that the remedies and rights set forth in Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et. seq.,* were available to a person aggrieved "by any recipient of Federal assistance or Federal provider of such assistance" under section 504. Thus, given the similarities in purpose and wording of the respective parallel sections of the Act, it would seem appropriate to borrow the § 504 definition of what is a "qualified handicapped person" as well as § 504 case analysis when addressing the matter at bar.[6]

---

**5.** 29 U.S.C. § 794 provides in pertinent part:
No otherwise qualified individual with handicaps in the United States, as defined in section 706(8) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

**6.** "No court has yet defined 'qualified handicapped person' under Section 501. Although this case does not arise under § 504, there is no reason that the § 501 definition should differ from that of § 504, except that § 501 and its regulations impose an explicit requirement that accommodation of the handicap be considered in determining a handicapped person's qualifi-

■ The Rehabilitation Act constitutes a federal employee's exclusive remedy for claims of handicap discrimination in employment. *Wright v. Tisch,* 45 F.E.P. Cases 151 (E.D.Va.1987); *McGuinness v. United States Postal Service,* 744 F.2d 1318, 35 F.E.P. Cases 1762 (7th Cir.1984).

In enacting and amending the Act, Congress enlisted all programs receiving federal funds in an effort "to share with handicapped Americans the opportunities for an education, transportation, housing, health care, and jobs that other Americans take for granted." 123 Cong.Rec. 13,515 (1977) (statement of Senator Humphrey). To that end, Congress not only increased federal support for vocational rehabilitation, but also addressed the broader problem of discrimination against the handicapped by including § 504, an anti-discrimination provision patterned after Title VI of the Civil Rights Act of 1964.

■ Determination of whether an employer has met its obligations under the Act begins with a two-pronged analysis: first, whether the employee is a handicapped person within the meaning of the Act, and, if so, whether the employee, "with or without reasonable accommodation, can perform the essential functions of the position in question ..." 29 C.F.R. § 1613.702(f). However, even "when a handicapped person is not able to perform the essential functions of [a] job, the employer, and later the court, must also consider whether any 'reasonable accommodation' by the employer would enable the handicapped person to perform those functions." *AFGE, Local 51 v. Baker,* 677 F.Supp. 636 (N.D.Cal.1987).

In 1974 Congress expanded the definition of "handicapped individual," n/k/a "individual with handicaps," for use in § 504 to read as follows:

... the term "individual with handicaps" means ... any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a

cations for federal employment." *Mantolete v.*

record of such an impairment, or (iii) is regarded as having such an impairment. 29 U.S.C. § 706(8)(B).

From the Supreme Court:

In determining whether a particular individual is handicapped as defined by the Act, the regulations promulgated by the Department of Health and Human Services are of significant assistance. As we have previously recognized, these regulations were drafted with the oversight and approval of Congress, *see Consolidated Rail Corporation v. Darrone,* 465 U.S. 624, 634–35, and nn. 14–16, 79 L.Ed.2d 568, 104 S.Ct. 1248 [1254–55, and nn. 14–16] (1984); they provide "an important source of guidance on the meaning of § 504." *Alexander v. Choate,* 469 U.S. 287, 304, n. 24, 83 L.Ed.2d 661, 105 S.Ct. 712 [722, n. 24] (1985). The regulations are particularly significant here because they define two critical terms used in the statutory definition of handicapped individual. [footnote] "Physical impairment" is defined as follows:

"[A]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genitourinary; hemic and lymphatic; skin; and endocrine."

45 C.F.R. § 84.3(j)(2)(i) (1985).

In addition, the regulations define "major life activities" as:

"functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."

§ 84.3(j)(2)(ii).

*School Board of Nassau County, Florida and Craig Marsh v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987).

It should be noted that those listed above are common examples of potentially qualifying impairments but should not be taken as an exhaustive list. The Department of Health and Human Services has deliberat-

*Bolger,* 767 F.2d 1416, 1421 (9th Cir.1985).

ely chosen *not* to attempt to "set forth a list of specific diseases and conditions that constitute physical or mental impairments because of the difficulty of ensuring the comprehensiveness of any such list." 45 C.F.R. pt. 84, App.A., p. 310 (1985).

"An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." *Southeastern Community College v. Davis*, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). "In the employment context, an otherwise qualified person is one who can perform the 'essential functions' of the job in question. 45 C.F.R. § 84.3(k) (1985). When a handicapped person is not able to perform the essential functions of the job, the court must also consider whether any 'reasonable accommodation' by the employer would enable the handicapped person to perform those functions. *Ibid.* Accommodation is not reasonable if it either imposes 'undue financial and administrative burdens' on [an employer] ... or requires 'a fundamental alteration in the nature of [the] program' ..." *Arline*, 480 U.S. at ——, n. 17, 107 S.Ct. at 1131, n. 17, 94 L.Ed.2d at 321, n. 17.

However, though the Supreme Court has held that non-government employers need not accommodate if the accommodation would require "more than a *de minimis* cost," *TransWorld Airlines v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), the legislative history of § 501 of the Act (applying solely to the federal government as employer) indicates that the contrary was intended with respect to the government. Indeed, the official general policy of the government, as stated in 29 C.F.R. § 1613.703 is that "(t)he Federal Government shall become a model employer of handicapped individuals." Also:

"As the debate over the McClure amendment shows, Congress was unwilling to approve language that would have limited the government's duty to make reasonable accommodation to instances in which the cost of accommodation does not disproportionately exceed actual damages."

*Prewitt v. United States Postal Service*, 662 F.2d 292 (5th Cir.1981).

Thus, as a representative of the Department of the Army, and therefore the Federal Government, the defendant has a high burden to meet when confronted with the need to accommodate a handicapped employee.

## III

### A. *Whether Handicapped*

Within this statutory and regulatory framework, then, we must first consider whether Mrs. Harrison can be considered a handicapped individual.

As did the Supreme Court in *Arline*, we look to the Code of Federal Regulations for guidance as to what might constitute an impairment. Again, 45 C.F.R. § 84.3(j)(2)(i)(A) (1987) defines "physical impairment" as follows:

[A]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine ...

That opinion also quoted from 45 C.F.R. § 84.3(j)(2)(ii), defining "major life activities," as follows:

"Major life activities" means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

The Court finds that when taken as a whole, the medical evidence, as well as the testimony of Mrs. Harrison, establishes that the surgery performed on Mrs. Harrison, including the removal of substantial amounts of muscle from her upper arm and shoulder area, did in fact leave her in a handicapped condition. This conclusion is consistent with the finding of the EEO investigator who likewise found that Mrs. Harrison was handicapped within the meaning of the Act. That finding, and the resulting actions of her employer subse-

quent to that finding, is persuasive evidence of not only the existence of her handicap, but also of the fact that she was so "regarded" by her employer within the meaning of 29 U.S.C. § 706(8)(B)(iii).[7] The fact that the defendant purported to act on the recommendation of the EEO investigator by telling plaintiff that it was complying with the recommendation and by leading plaintiff to believe it would accommodate her condition by transferring her to another job supposedly less physically demanding, is ample reason for this Court to conclude that her employer regarded her as handicapped.

However, even if this were not reason enough to qualify her as handicapped, the Court need only point to § 706(8)(B)(i) which provides that one with a physical impairment will be deemed handicapped if the impairment "substantially limits one or more ... major life activities." It cannot be seriously disputed that Mrs. Harrison's impairment affected her ability to work. That is self-evident. Working is clearly among one's "major life activities." 45 C.F.R. § 84.3(j)(2)(ii). *Ergo*, even if one assumes, *arguendo*, that Mrs. Harrison's condition impairs *only* her ability to work, then she nonetheless clearly qualifies as handicapped within the meaning of the Act.

The Supreme Court has already ruled that such an analysis is not "a totally circular argument which lifts itself by its bootstraps.' Tr. of Oral Argument, p. 15–16. The argument is not circular, however, but direct. Congress plainly intended the Act to cover persons with a physical or mental impairment (whether actual, past, or perceived) that substantially limited one's ability to work." *Arline*, 480 U.S. at ——, n. 10, 107 S.Ct. at 1129 n. 10, 94 L.Ed.2d at 318, n. 10.

Thus, this Court is quite comfortable in finding Mrs. Harrison handicapped within the meaning of the Act.

## B.  *Whether accommodated*

As stated above, the second "prong" of the two-pronged test is whether a handicapped employee, given "reasonable accommodation, can perform the essential functions of the position in question ..." 29 C.F.R. § 1613.702(f).

The defendant has known of Mrs. Harrison's handicap ever since her surgery. For many years, her supervisors took steps to accommodate her condition by rarely requiring her to do continuous typing for prolonged periods of time. She was allowed to intersperse her filing and other miscellaneous duties with her typing so as not to aggravate her condition. Furthermore, she was never required to work on the Beltline except as a relief typist. However, after Mr. Batchelder and Mr. Howell assumed supervisory positions over plaintiff, she was regularly required to do heavy typing which aggravated her condition. Of special note, she was required to work on the Beltline, an action taken by the government which precipitated injuries to her sufficient to require hospitalization.

After Mrs. Harrison filed a formal complaint which resulted in a finding that the defendant had not taken appropriate steps to accommodate her, the defendant was ordered to do so by the investigating agency. The government's only response was to take measurements of her desk and typewriter and to adjust their height a few inches.

Furthermore, the government, one would hope unintentionally, badly misstated the law when "informing" Mrs. Harrison of her rights with regard to interviewing for a new position and when explaining to her its own responsibilities with regard to finding her a new job or modifying her old one. Their "one job only" offer to Mrs. Harrison resulted in her taking a position even more poorly suited for her than the one previous due to the amount and type of work required of her.

---

7.  As stated above, 29 U.S.C. § 706(8)(B) defines an "individual with handicaps" to mean "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment."

The lengths to which an employer must go in attempting to accommodate a handicapped employee vary with the entity's ability to do so without incurring "undue hardship." 29 C.F.R. § 704(a). "[F]actors to be considered include: (1) the overall size of the agency's program with respect to the number of employees, number and type of facilities and size of budget; (2) the type of agency operation, including the composition and structure of the agency's workforce; and (3) the nature and cost of the accommodation." Furthermore, the burden is on the employer to prove the inability to accommodate. *Prewitt v. United States Postal Service*, 662 F.2d 292 (5th Cir.1981).

■ Given the overall size of the government's operation at the Fort, the budget, number of employees, etc. and the large number of positions at the Fort of seemingly comparable skill requirements, it is apparent to this Court that the defendant has done a woefully inadequate and totally unacceptable job of accommodating Mrs. Harrison's handicapped condition within the meaning of, and as required by, the applicable statutes and regulations.

### IV

The portion of the Act which provides for remedies available to a successful claimant, 29 U.S.C. 794a, is set out below:

(a)(1) The remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e–16), including the application of sections 706(f) through 706(k) (42 U.S.C. 2000e–5(f) through (k)), shall be available, with respect to any complaint under section 791 of this title, to any employee or applicant for employment aggrieved by the final disposition of such complaint, or by the failure to take final action on such complaint. In fashioning an equitable or affirmative action remedy under such section, a court may take into account the reasonableness of the cost of any necessary work place accommodation, and the availability of alternatives therefor or other appropriate relief in order to achieve an equitable and appropriate remedy.

(2) The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d et seq.] shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title.

(b) In any action or proceeding to enforce or charge a violation of a provision of this subchapter, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

Section 717(d) of the Civil Rights Act (42 U.S.C. § 2000e–16(d)) provides that "[t]he provisions of section 2000e–5(f) through (k) of this title, as applicable, shall govern civil actions brought hereunder."

Title 42 U.S.C. § 2000e–5(g), in turn, sets out a non-exhaustive list of the remedies available to the court in such matters brought before it, to wit:

If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), *or any other equitable relief as the court deems appropriate* ... (emphasis added).

A court can in appropriate circumstances order a promotion as relief for a victim of discrimination, but cannot under Title VII properly order the promotion of an employee to a position for which he or she is not qualified. *Locke v. Kansas City Power and Light Co.*, 660 F.2d 359 (8th Cir.1981).

The Court finds that, had Mrs. Harrison's employer acted responsibly, it would have been probable that Mrs. Harrison

would be working at a higher grade level by now with a reasonable opportunity for future advancement. Instead, the government gave her a "one-shot deal" which resulted in an increased workload with no commensurate increase in pay, an aggravation of her physical condition, and no realistic possibility of her advancing professionally between now and when she retires.

The question remains, therefore, whether the plaintiff would be qualified to hold a higher position with her present employer.

 The evidence indicates there are literally hundreds of civilian positions at the Fort[8] with a good number of those being office jobs not very dissimilar to what Mrs. Harrison has done in the past. Further, the Court heard evidence at the initial trial, as well as at the subsequent December 21, 1987 hearing, that Mrs. Harrison had a history of good job evaluations and that she had been acquiring some amount of training in rudimentary, office-type programing and data-processing. Finally, it is apparent to the Court that, for a variety of factors, it would not be productive for Mrs. Harrison to continue working under her current supervisors.

Accordingly, the Court orders

(A) that the defendant shall immediately take all necessary steps to accommodate the plaintiff's handicap;

(B) that Mrs. Harrison be transferred to another office at the Fort;

(C) that her new position should offer her a realistic opportunity for future advancement assuming that her future job evaluations warrant such;

(D) that regarding future pay, the plaintiff shall immediately be compensated at the level of GS 4, Step 9;

(E) that the defendant is required to file with the Court, no later than May 6, 1988, a list of all secretary-receptionist positions at Fort Leonard Wood in which the employee is the sole receptionist for four or more people *and* the only typist for those persons. The listing should also show the GS rating of each person, the pay of each

person, and the number of years of service of each such person. The Court will compute and award back pay based on that information. Further, the Court will order a promotion to an appropriate GS grade level once the required information is filed.

(F) that the Court will award an attorney's fee. Counsel for the plaintiff will provide the Court an itemization of his time and expenses incurred in his handling of this case within fifteen (15) days of the date of this order. Defendant shall then have ten (10) days in which to respond.

IT IS SO ORDERED.

---

**8.** Statistics furnished by the USACARA as of December 5, 1983, showed that Fort Leonard Wood had a combined civilian workforce of 2,188 employees.