**Marilyn CORNMAN, Plaintiff,**

v.

**N.P. DODGE MANAGEMENT COMPANY, Defendant.**

**No. Civ. 4–96–1129(DWF/RLE).**

United States District Court,
D. Minnesota.

Feb. 22, 1999.

Reinhardt & Anderson, St. Paul, MN, for Jeffrey R. Anderson, Joanne J. Mullen, plaintiff.

Erickson & Sederstrom, Omaha, NE, for Soren S. Jensen, defendant.

Mohrman Law Office, Minneapolis, MN, for William F. Mohrman, defendant.

## MEMORANDUM OPINION AND ORDER

FRANK, District Judge.

### Introduction

This matter is before the Court upon Petitioner's objections to Magistrate Judge Raymond L. Erickson's Report and Recommendation dated November 12, 1998 (Doc. No. 23), recommending that Defendant's Motion for Summary Judgment be granted and Plaintiff's complaint be dismissed with prejudice. The Court has conducted a *de novo* review of the record. 28 U.S.C. § 636(b)(1); Local Rule 72.1(c). Based on that review, the Court adopts the Report and Recommendation with respect

to Count III (discrimination on the basis of age in violation of the Age Discrimination in Employment Act), Count IV (discrimination on the basis of age in violation of the Minnesota Human Rights Act), Count V (discrimination on the basis of gender in violation of the Civil Rights Act of 1964), and Count VI (discrimination on the basis of gender in violation of the Minnesota Human Rights Act) of Plaintiff's Complaint and grants summary judgment to Defendant on those Counts. The Court denies Defendant's Motion for Summary Judgment with respect to Count I (discrimination on the basis of disability in violation of the Americans with Disabilities Act) and Count II (discrimination on the basis of disability in violation of the Minnesota Human Rights Act).

### Background

Magistrate Erickson's Report and Recommendation gives a thorough accounting of the facts underlying this case; this Court, then, will limit itself to a brief recounting of the facts relevant to the disability discrimination claims.

Defendant N.P. Dodge Management Company ("N.P.Dodge") is a company based in Omaha, Nebraska, which manages commercial and residential rental properties; Paul Curry ("Curry") is and has been the president of N.P. Dodge for all of the years relevant to this case. Plaintiff Marilyn Cornman ("Cornman") began working for N.P. Dodge in 1973 in Omaha. Cornman was by all accounts an exemplary employee and was continually promoted. When N.P. Dodge decided to expand its business into Minnesota, Cornman was chosen to oversee that expansion. In 1990, Cornman permanently relocated to Minnesota to head N.P. Dodge's enterprise here.

In August of 1992, Plaintiff began suffering pain in here right arm; the pain disrupted her sleep and thus deprived her of energy during the day. On October 26, 1992, Plaintiff was in Omaha for a routine physical; her physician in Omaha informed her that the pain was the result of ruptured silicone gel breast implants. Cornman had gotten the implants in 1976, following a mastectomy to treat breast cancer. On October 27, 1992, Plaintiff had scheduled a colonoscopy and had an appointment just after that to see her plastic surgeon about removal of the breast implants. At Cornman's request, Curry drove Cornman from one doctor's appointment to the next. During the trip, Cornman informed Curry of the breast implant ruptures and the need to have the implants removed.

During the following few weeks, Cornman apparently saw a number of physicians. At some point, she learned that removal of the implants could trigger a recurrence of her breast cancer. She informed Curry of this possibility and her concern for her health; Curry allegedly stated that he didn't believe "it" (that Cornman's cancer would return).

In this same general time frame, Cornman and her staff began experiencing problems with one of the residential properties they managed, an apartment complex called Lake Cove.[1] Cornman had several discussions with representatives of the owners of Lake Cove regarding a downturn in occupancy which Cornman attributed, at least in part, to the influx of a more ethnically diverse population and to some difficulty securing quality grounds maintenance. The Lake Cove owners were apparently quite concerned with the occupancy rate there and contracted with one of N.P. Dodge's competitors to "shop" the complex.[2] This competitor "shopped" the Lake Cove complex on November 15, 1992, and sent a letter with the results to the Lake Cove owners on November 19,

---

**1.** It is unclear from the record when the occupancy issue at Lake Cove first came up.

**2.** "Shopping" of rental property is a sort of undercover investigation of the management and leasing practices of the management company; the "shopper" inquires about renting in the complex and then prepares a report on the presentation of the property and the skills of the leasing agent.

1992. Based upon this competitor's report, the owners indicated that, if N.P. Dodge was unable to remedy the low occupancy rate, they would have to employ a different management company.

Sometime in late November, Curry contacted Cornman to relate a concern expressed by the Lake Cove owners that Cornman seemed to be absent from the office quite frequently. Cornman responded to Curry, via a letter dated November 23, 1992, with a list of days she had been on leave (either vacation leave or sick leave) during that year; she pointed out that she had not been gone all that often and had not even taken all of the vacation time she was due that year. Curry further told Cornman that she should not mention her medical condition to the Lake Cove owners or any other clients of N.P. Dodge.

Despite this admonition, Cornman notified the Lake Cove owners, via a letter dated November 24, 1992, that she was having breast implants removed on November 30 and that she would be convalescing for roughly 4 to 6 weeks. In the letter, she assured the owners that their property would be cared for by her temporary replacement, Ross Feder.

On January 5, 1993, Paul Curry and Marilyn Cornman met for lunch; Cornman had arranged the meeting to discuss when she would be cleared to return to work. At this lunch meeting, Curry told Cornman that she was being terminated due to an overall lack of performance relating to the Lake Cove apartment complex. Although Curry mentioned the possibility of finding a position for Cornman back in Omaha, no such position was found.

### Discussion

**1. Standard of Review**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court must view the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir.1996). However, as the Supreme Court has stated, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" Fed.R.Civ.P. 1. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Krenik*, 47 F.3d at 957. Still, in employment discrimination cases, the Court of Appeals has repeatedly warned that summary judgment should be granted sparingly in such causes of action; employment discrimination cases frequently rise and fall on the inferences to be drawn from circumstantial factors, and, accordingly, the Court should be careful not to usurp the job of the fact-finder. *Davis v. Fleming Companies*, 55 F.3d 1369, 1371 (8th Cir.1995); *Oldham v. West*, 47 F.3d 985, 988 (8th Cir.1995); *Hardin v. Hussmann Corp.*, 45 F.3d 262, 264 (8th Cir. 1995); *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994); *Gill v. Reorganized School Dist. R-6, Festus, Missouri*, 32 F.3d 376, 378 (8th Cir.1994).

**2. Disability Discrimination Claims**

To state a prima facie case for discrimination on the basis of disability under the Americans with Disabilities Act or the

Minnesota Human Rights Act,[3] the Plaintiff must establish: (1) that she is disabled within the meaning of these statutes; (2) that she is qualified to perform the essential functions of the job (either with or without reasonable accommodation); and (3) that she suffered an adverse employment action under circumstances which could give rise to an inference of discrimination. *Gutridge v. Clure,* 153 F.3d 898, 900 (8th Cir.1998); *Young v. Warner–Jenkinson, Co., Inc.,* 152 F.3d 1018, 1021 (8th Cir.1998). The sticking point in the current case seems to be whether the Plaintiff is disabled within the meaning of the statute.

■ Under the ADA,
An individual is considered to have a "disability" if that individual either (1) has a physical or mental impairment which substantially limits one or more of that person's major life activities, (2) has a record of such an impairment, or, (3) is regarded by the covered entity [employer] as having such an impairment.

29 C.F.R. § 1630.2(g) interpretive guidance[4]; 42 U.S.C.A. § 12102(2). Defendant maintains that, at the time of her discharge, Plaintiff was not suffering from any physical or mental impairment which substantially limited her major life activities. On this point, the Court must reluctantly agree.

The Court finds adequate evidence in the record to support the notion that, while it lasted, the silicone leakage and attendant pain disrupted Cornman's sleep and interfered with her ability to concentrate at work. However, when determining whether a medical condition amounts to a disability under the ADA, the Court must take into consideration the severity, duration, and lasting impact of the condition. 29 C.F.R. § 1630.2(j) interpretive guidance; *Aucutt v. Six Flags Over Mid–America, Inc.,* 85 F.3d 1311, 1319 (8th Cir.1996). Here, the Plaintiff began experiencing pain in October of 1992, had surgery to remove the implants in December of 1992, and was released to work by her physician in January of 1993. While the Court recognizes that the pain Plaintiff endured during that four months was severe and limited the Plaintiff's ability to conduct a normal life, there is no evidence in the record that the silicone leakage produced any long-term or permanent disability.

Plaintiff notes in her objections to the Magistrate's Report and Recommendation that the leaked silicone infiltrated the tissue of her lymph nodes and attached to her nerve endings. (Plaintiff's Objections to Report and Recommendation of Magistrate Judge Erickson Filed on November 12, 1998, p. 3.) The Court in no way wishes to trivialize or dismiss this situation; however, the record does not indicate that this infiltration or attachment has caused any persistent pain or that the Plaintiff's condition will require ongoing treatment. In short, the record intimates that the *impairment* persists, but there is simply nothing in the record to support a conclusion that the substantial limitation of ma-

---

3. The Minnesota Human Rights Act prohibits discrimination in the employment context against individuals with disabilities. Minn. Stat. § 363.03(1). The M.H.R.A. defines a person with a disability as "any person who (1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment." Minn.Stat. § 363.01(13). Thus, the M.H.R.A. is slightly more lenient than the ADA in terms of the degree to which a person must be impaired before her condition is considered a disability. Nevertheless, the courts of the Eighth Circuit have consistently analyzed claims under the

M.H.R.A. disability provision as analogous to claims under the ADA. *See, e.g., Miners v. Cargill Communications, Inc.,* 113 F.3d 820 (8th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 441, 139 L.Ed.2d 378 (1997); *Roberts By and Through Rodenberg–Roberts v. Kinder-Care Learning Centers, Inc.,* 86 F.3d 844 (8th Cir.1996).

4. All references to the "interpretive guidance" of a Code of Federal Regulations section are to the E.E.O.C.'s interpretive guidance on that particular section, located in the Appendix to § 1630 of Chapter 29 of the Code of Federal Regulations.

jor life activities, to the extent that it existed during the four month duration of Plaintiff's condition, persists. As a result, the Court concludes that—based upon the record currently before it—the silicone leakage did not itself amount to a disability under the ADA. As the silicone leakage was the only condition from which the Plaintiff was suffering *at the time of her discharge,* the Court concludes that Plaintiff does not meet the requirements of the first prong of the disability definition.

Moreover, the Court agrees with the Defendant and Magistrate Judge Erickson that the record does not support a claim that Defendant regarded the Plaintiff as disabled.

There are three different ways in which an individual may satisfy the definition of "being regarded as having a disability":

(1) The individual may have an impairment which is not substantially limiting but is perceived by the employer or other covered entity as constituting a substantially limiting impairment;

(2) The individual may have an impairment which is only substantially limiting because of the attitudes of others toward the impairment; or

(3) The individual may have no impairment at all but is regarded by the employer or other covered entity as having a substantially limiting impairment. 29 C.F.R. § 1630.2(1) interpretive guidance (citing S.Rep. No. 116, 101st Cong., 1st Sess. 23 (1989); H.R.Rep. No. 485 part 2, 101st Cong., 2d Sess. 53 (1990); H.R.Rep. No. 485 part 3, 101st Cong., 2d Sess. 29 (1990)). In support of the claim that Defendant regarded Plaintiff as disabled, Plaintiff points to a concern expressed by Paul Curry that Plaintiff was spending too much time away from the office (Plaintiff's Ex. 17 in Opposition to Defendant's Motion for Summary Judgment (Memo from Marilyn Cornman to Paul Curry dated November 23, 1992)), Curry's order that Plaintiff not tell property owners about her condition (Deposition of Marilyn Cornman at 33, lns. 8–11), and

Curry's statement to Plaintiff just prior to her surgery that he was worried about her cancer returning (Deposition of Marilyn Cornman at 47, lns. 2–5).

■ With respect to the first piece of evidence offered by the Plaintiff, there is nothing in the record which suggests that the concern over absences had anything to do with Plaintiff's illness. Instead, the record indicates that the source of the complaint was two property owners who were unaware that Plaintiff was experiencing any health problems. This does not suggest that Defendant perceived the Plaintiff as suffering from a more serious impairment or as being more limited in her life activities than she actually was.

Curry's admonition that the Plaintiff not tell the property owners about her medical condition does indicate that Curry was concerned about Plaintiff's risk of being stricken again with cancer. Similarly, his alleged statement to Plaintiff that he was worried about her cancer returning would suggest that Defendant perceived Plaintiff as more susceptible or prone to cancer than other people and that that susceptibility was a source of concern to Defendant. These facts, however, do not support a finding that Defendant or Paul Curry regarded Cornman as being disabled. A "characteristic predisposition to illness or disease" does not qualify as an impairment, 29 C.F.R. § 1630.2(h) interpretive guidance; thus, the fact that Defendant regarded Plaintiff as predisposed to some illness cannot, by definition, mean that Defendant regarded Plaintiff as disabled.

However, the Americans with Disabilities Act further defines "disability" as a record of an impairment which, if it existed at the time of the adverse employment action, would render the person presently disabled. 42 U.S.C.A. § 12102(2)(B). The E.E.O.C. interpretive guidance states that, "[f]or example, this provision protects former cancer patients from discrimination based on their prior medical history." 29 C.F.R. § 1630.2(k) interpretive guidance.

Cornman was treated for breast cancer in 1976; her mastectomy alone required a

hospital stay of 2 weeks. (Deposition of Marilyn Cornman at 54, lns. 19–25.) Whether cancer, specifically breast cancer, is a disability under the ADA is not a cut and dried issue. *See, generally, Shea v. Village Green Care Center, Ltd.*, 1998 WL 960307, 1998 U.S.Dist. Lexis 16470 (E.D.N.C.1998) (record of cancer can be a record of a disability); *Vendetta v. Bell Atlantic Corp.*, 1998 WL 575111, 1998 U.S. Dist. Lexis 14014 (E.D.PA.1998) (cancer may be a disability under the ADA); *but see Madjlessi v. Macy's West, Inc.*, 993 F.Supp. 736 (N.D.Ca.1997) (breast cancer or a history thereof is not a qualifying disability in that it did not substantially limit any major life activity). However, there are several factors which incline the Court to conclude that a reasonable finder of fact could determine Plaintiff's cancer to be a disability for purposes of the "record of" portion of the ADA.

First, the U.S. Supreme Court in *School Board of Nassau Co. v. Arline*, 480 U.S. 273, 281, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), concluded that the record of a past impairment which was "serious enough to require hospitalization" was sufficient to have affected one or more major life activities. Moreover, the Supreme Court's recent decision in *Bragdon v. Abbott*, 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (even asymptomatic HIV infection substantially impairs a woman's ability to reproduce or bear children and is therefore a disability under the ADA), indicates that even life activities which do not have economic or "daily" consequences may be considered "major life activities." Extending the rationale of *Bragdon*, this Court concludes that an impairment which impedes, limits, or otherwise negatively affects a person's sexual relations in a substantial way may be considered a disability under the ADA. This society clearly considers a woman's breasts to be an integral part of her sexuality, the loss of which would necessarily involve some significant impact on her sexual self-image. The record before the Court, then, presents a genuine issue of material fact as to whether the Plaintiff's breast cancer in

the mid–1970s was a disability under the meaning of the ADA.

Finally, Congress clearly intended to protect individuals from discrimination due to the inaccurate or prejudiced perceptions of third parties that certain impairments are more debilitating than they really are; the E.E.O.C. has stated that "[a]n individual satisfies the second part of the 'regarded as' definition if the individual has an impairment that is only substantially limiting because of the attitudes of others toward the condition." 29 C.F.R. § 1630.2(1) interpretive guidance. The U.S. Supreme Court has further indicated that an employer cannot consider the possible negative reactions or stereotypes of third-parties to the impairment of which the employee has a record. *Arline*, 480 U.S. at 282–283, 107 S.Ct. 1123. Paul Curry's admonition to Plaintiff not to inform clients of her illness coupled with the Lake Cove owner's expressed concern over Plaintiff's availability and absenteeism could give rise to the inference that the Defendant was worried about the Lake Cove owners' perception of Plaintiff's competence should she become sick again. Thus, whether or not Plaintiff's cancer genuinely had a substantial impact on a major life activity, it is possible to conclude that, while Defendant may not have had a skewed perception of the effect of a cancer recurrence, Defendant acted out of fear of the reaction of clients. In other words, even if Plaintiff's situation and the record thereof does not place her squarely within the definition of a "record of" disability, she may be classified as a person with a disability through an analysis which bridges the "record of" and "regarded as" prongs of the definition of a disabled person in that she has a record of a condition which, in light of the attitudes of Defendant's clients, Defendant regarded as a disability.

In sum, the Court is mindful of the E.E.O.C.'s guidance, noted above, which indicates that people with a history of cancer are precisely the type of individuals

the "record of" provision is meant to protect. The Court concludes that there is adequate evidence in the record from which a reasonable jury could conclude that the Defendant became aware of Plaintiff's past impairment—an impairment which led to a grave anatomical loss, and which either did substantially limit a major life activity or might be perceived as so limiting by Defendant's clients—and sought to terminate Plaintiff's employment as a result, out of fear of a recurrence of cancer. The Plaintiff's medical condition in 1992, originating with the rupture of her silicone breast implants, simply made this record of disability salient to the Defendant. As a result, the Court concludes that a reasonable jury could find that Plaintiff is a qualified individual with a disability, in that she has a record of an impairment which substantially limits one or more major life activities.

Once Plaintiff has established her prima facie case, the burden then shifts to the Defendant to assert a legitimate reason for her termination. *Young v. Warner–Jenkinson, Co., Inc.*, 152 F.3d 1018, 1021 (8th Cir.1998). Here, Defendant maintains that Plaintiff was terminated because of declining occupancy rates in one of the complexes over which Plaintiff had control and the resulting complaints of the complex owners. Specifically, Defendant asserts that Plaintiff's mismanagement of the Lake Cove complex resulted in the owners of that complex threatening to change management companies and, in effect, placing the Defendant "on probation." (Plaintiff's Exhibit 30 in Opposition to Defendant's Motion for Summary Judgment (letter from Paul Curry to Marilyn Cornman dated January 5, 1993)).

With that legitimate basis for termination established, the burden finally shifts to the Plaintiff to show that the proffered legitimate reason is merely pretextual. *See, e.g., Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 777 (8th Cir. 1995). Several factors would seem to create a genuine issue of material fact as to whether Defendant's proffered reason for

terminating Plaintiff was pretextual. First, Paul Curry had expressed complete satisfaction with Plaintiff's job performance as late as July 24, 1992, after a visit to the Minneapolis offices. (Plaintiff's Exhibit 24 in Opposition to Defendant's Motion for Summary Judgment (letter from Paul Curry to Marilyn Cornman dated July 24, 1992)). Second, there is some indication that the Lake Cove owners, while deeply concerned about the occupancy rates, were satisfied with the plans established by N.P. Dodge prior to a meeting with the owners on December 1, 1992 (Plaintiff's Exhibit 20 in Opposition to Defendant's Motion for Summary Judgment (memo from Nancy Roberts to Paul Curry and Jane Reilly dated December 4, 1992)); while this meeting took place after Plaintiff had begun her medical leave, it was on the first day after that leave began. Third, the record suggests that Defendant failed to follow its own policies with respect to the issuance of both an oral warning and a written warning prior to termination. (Plaintiff's Exhibit 31 in Opposition to Defendant's Motion for Summary Judgment.) Fourth, Plaintiff has pointed out that the occupancy rates did not significantly increase in the first few months after Plaintiff ceased managing the Lake Cove property. Finally, the Plaintiff points out the remarkable synchronicity between Plaintiff notifying Defendant of her possible future health problems and Defendant's precipitous dissatisfaction with Plaintiff's performance. In short, Plaintiff has pointed to a number of factors which, taken together, could lead a reasonable jury to conclude that the proffered reason for Defendant terminating Plaintiff was merely pretextual.

For the reasons stated, **IT IS HEREBY ORDERED:**

That the Defendant's Motion for Summary Judgment (Doc. No. 13) is **denied in part** and **granted in part,** as follows:

1. Summary judgment as to the claims for discrimination on the basis of

age and discrimination on the basis of gender pursuant to Title VII, the ADEA, and the Minnesota Human Rights Act is **granted,** and these claims are dismissed with prejudice.

2. Summary judgement as to the claims for discrimination on the basis of disability pursuant to the ADA and the Minnesota Human Rights Act is **denied.**