199 F.Supp.2d 949 (2002)
Susan A. TREIBER, Plaintiff,
v.
LINDBERGH SCHOOL DISTRICT, Defendant.
No. 4:00CV2004 TCM.
United States District Court, E.D. Missouri, Eastern Division.
April 11, 2002.
*950 *951 David M. Heimos, Heimos Law Office, Clayton, MO, for plaintiff.
Charles S. Elbert, Partner, John Gianoulakis, Partner, Jennifer L. Rogers, Kohn and Shands, St. Louis, MO, for defendant.

MEMORANDUM AND ORDER
MUMMERT, United States Magistrate Judge.
This employment discrimination action is before the Court[1] on the motion of defendant, Lindbergh School District, for summary judgment on the complaint filed *952 by plaintiff, Susan Treiber, alleging that her teaching contract was not renewed because of a disability, or perception or record thereof, in violation of the American with Disabilities Act, 42 U.S.C. §§ 12101-12213.

Background
Having twelve years of teaching experience, Susan Treiber ("Plaintiff") was hired by the Lindbergh School District ("Defendant") as a music teacher for the 1995-96 school year. (Pl.Ex. A; Undisputed Facts ¶ 3.) Her teaching contract was renewed for the 1996-97, 1997-98, and 1998-99 school years. (Id. ¶ 12.) Plaintiff taught elementary, middle school, and high school band and elementary and middle school strings. (Id. ¶ 9.)
In January 1999, Plaintiff was given an "Intent to Return" letter. (Pl.Ex. 6.) The letter asked "who, if offered a contract, will be returning for the coming [1999-2000] year." (Id.) The letter also cautioned the recipient, "[n]either this `intent to return' form nor your signature constitutes a contractual obligation by either party." (Id.) Plaintiff signed and returned the form on January 21. (Id.)
On or about February 1, Plaintiff had a mammogram. (Undisputed Facts ¶ 24.) A suspicious mass was revealed and a needle biopsy was performed. (Id.) On February 3, she was told by her physician that she had breast cancer, Stage II, and would need surgery. (Id. ¶ 25; Def. Ex. L.) She visited with her physician, Jeffrey F. Moley, M.D., the next day. (Id.)
On February 5, Plaintiff completed a leave request form, asking that she be granted sick leave for the period from February 12 to February 26. (Def.Ex. M.) The reason given was "surgery." (Id.) When asked by the principal's secretary why she was having the surgery, Plaintiff explained that she would rather not talk about it. (Pl. Dep. at 77.) Her request was granted that same day. (Def.Ex. M.) On February 8, Dr. Moley wrote a letter to "Whom It May Concern," confirming that Plaintiff was under his care and unable to work from February 12 to February 26. (Def.Ex. N.) He was identified as being with the Department of Surgery, Washington University School of Medicine.[2] (Id.) His letter did not explain the reason for the surgery. (Id.) Plaintiff testified in her deposition that she could not remember telling anyone in the school district prior to her surgery that she had breast cancer. (Pl. Dep. at 86.) Nor did she have any information that anyone in the district knew. (Id.)
Plaintiff underwent a lumpectomy on February 9 or 11 to remove a mass from her left breast. (Id. at 57, 74-75.) A handwritten note dated March 1 and apparently signed by Dr. Motley cleared Plaintiff to return to work on "limited, light duty." (Def.Ex. J.) Plaintiff returned to work one day later than anticipated. (Def.Ex. U.) Her request for sick leave for that day was approved.[3] (Id.)
While on sick leave, Plaintiff received a memo from Shelton Smith, the Assistant Superintendent for Personnel, addressed to her, Michelle Howard, and Susan Rola on the subject of performance evaluations. (Def.Ex. R.) The memo informed the three teachers that performance evaluations had been completed for each and were on file. (Id.) The teachers were asked to make an appointment with Smith to review their *953 evaluations. (Id.) The memo concluded with the sentence, "Obviously, if there were any significant concerns and problems, you would have been contacted." (Id.) Added to Plaintiff's copy was a handwritten note  "Hope you fully recovered! Welcome back. Shelton." (Id.)
Also, in February 1999, Jim Sandfort, the Superintendent, sent Plaintiff a card with the printed words, "Hope you're up and flying soon!" and a handwritten note, "Sue, Hope your recovery is a speedy one." (Pl.Ex. 67.) Sandfort routinely sent employees get-well cards when they were on sick leave. (Sandfort Supp. Aff. ¶ 1; Burney Dep. at 17.) He routinely did not inquire into why a teacher requested sick leave. (Sandfort Supp. Aff. ¶ 3.)
On March 4, Plaintiff and two representatives of the teachers' union met with Smith.[4] At the beginning of the meeting, Plaintiff informed Smith that she had breast cancer and would be undergoing chemotherapy. (Pl. Dep. at 92.) The only people in the school district that she had told of her cancer before the meeting were the two representatives, Mary Hogan and Susan Burney. (Id. at 90-92.) Plaintiff, Hogan, and Burney each took notes at the meeting. (Def. Exs. R-1 to R-3.) Plaintiff's notes include the following: "hired because could teach strings [and] band[;] not strongest string candidate or strongest band candidate[; Smith] said I might lose my job if they eliminate elem[.] because principals would choose who they think is strongest candidate[.]" (Def.Ex. R-3.) Burney's recollection of the discussion was similar to Plaintiff's. (Burney Dep. at 27-28.) Additionally, it was Burney's perception coming into the meeting, based on what Plaintiff had told her, that there was a likelihood that Plaintiff would not be offered a contract for the next year. (Id. at 37.) Smith also said at the meeting that the District might hire specialist music teachers, for example, a person with low strings  cello and bass  experience. (Id. at 38.) Plaintiff emphasized that she could do whatever was necessary to continue teaching. (Id.) Smith's remarks to Plaintiff during the meeting were consistent with his notes of his 1995 interview with Plaintiff. (Id. at 39-40; Def. Ex. B.) Those notes included Smith's opinion that Plaintiff was not as strong as two other instrumental candidates or as one string candidate, but was adequate for both strings and instrumental.[5] (Def.Ex. B.)
Between March 4 and April 13, Plaintiff told other people in the school district that she had breast cancer, including Deb Peppers, a drama teacher; Carolyn Amen; Sue Rola; and Michelle Howard. (Id. at 102.) She testified in her deposition that she could not remember ever telling Sandfort about her cancer or the chemotherapy. (Id.) She did not discuss either with any member of the school board. (Id. at 103.) She had no information that Smith told Sandfort about her cancer or chemotherapy or that Smith or Sandfort told any member of the school board about her cancer or chemotherapy. (Id. at 103-04.) Sandfort avers that he did not know Plaintiff had or was being treated for breast cancer until after April 13. (Sandfort Aff. ¶ 8.) Vic Lenz, the Assistant Superintendent for Curriculum, also avers that he did not know about Plaintiff's breast cancer until December 1999. (Lenz Aff. ¶ 9.)
*954 On March 24, Smith wrote Plaintiff that "unsatisfactory" marks on her performance evaluations had been changed to "meets expectations." (Def.Ex. X.) He concluded with a "hope that her medical treatments had been successful." (Id.) Teacher evaluations provided for three ratings: "meets expectations"; "unsatisfactory"; and "not observed." (Def.Exs.3F-3I.) Written comments by the District Music Coordinator, Robert Tobler, on both of Plaintiff's 1996-97 and 1997-98 evaluations included an observation that Plaintiff needed to continue studying strings. (Id.)
On March 26, Smith wrote Plaintiff to "share some information with [her]." (Def.Ex. Y.) The information was, in relevant part, as follows.
When you were hired, you were not the strongest instrumental music teacher we interviewed; you were not the strongest strings candidate that we interviewed. However, you were one of the stronger applicants who could do both, and you could also teach vocal music. Thus, we recommended you for employment. One of the administration's responsibilities is to recommend to the Board of Education only the very best candidates who are available for employment. While you have been an asset in many ways, there have been concerns that we have already addressed, i.e., Crestwood parent and student concerns; Sperreng Middle School parent and student concerns related to Show Choir. I know that parents have expressed concerns to various Board members  not about any one thing, but just the fact that their children don't see your enthusiasm for music. Another concern that we have is that no principal will step forward and say that your students are "on fire" for you as a teacher, and none of them points to any significant accomplishments that you've made to make the music program exciting. Any significant growth and improvements that we've seen have been initiated by either other experienced music educators or the newer hires.
(Id.) He further informed Plaintiff that she should decide whether she wanted to submit a letter of resignation and seek other employment, with Defendant's support. (Id.) Smith cautioned Plaintiff that it was "more than likely" that she would not be re-employed. (Id.)
On April 9, Plaintiff and Hogan met with Smith. (Undisputed Facts ¶ 57.) Her notes from that meeting begin with "status doesn't look good; doesn't relate to performance; nothing I did wrong; anticipation in change in music program; much greater emphasis for strings at elem[entary] level; hired for versatility; not what district is looking for now." (Def.Ex. BB-1.) Plaintiff informed Smith that she would do what was needed. (Id.) Plaintiff also applied for a teaching position with the Parkway School District on or about April 10 and for a teaching position with the Ladue School District on or about April 13. (Undisputed Facts ¶¶ 61, 62.)
On April 13, the Board voted not to renew Plaintiff's teaching contract for the 1999-2000 school year. (Id. ¶ 63.) If the Board had not voted before April 15 not to renew Plaintiff's teaching contract for what would have been her fifth year of teaching, Plaintiff would have been considered a "permanent teacher." Mo.Rev.Stat. §§ 168.03(4); 168.12. The Board of Education is the ultimate decision maker on personnel decisions. (Smith Dep. at 11-12.) The next day, Plaintiff received a letter from Smith telling her that the Board of Education had voted not to offer her a contract for the 1999-2000 school year because it had determined that she did not meet Defendant's instructional needs. (Pl. Dep. at 137-38; Def. Ex. CC.) Plaintiff's last day of teaching under her contract *955 was June 7; however, she taught summer school. (Def.Ex. H.)
When later asked by Plaintiff to give a concise statement why her contract had not been renewed, Smith replied,
Our music program and schedule have changed since the 1998-99 school year as a result of recent Board of Education action. When you were hired, we needed someone whose primary teaching assignment was instrumental music but who could teach basic strings if needed. For the 1999-2000 school year, our staffing need is someone whose specialty is lower strings, and we prefer that the person have Suzuki training and teaching experience. In our judgment, you do not fill our instructional needs.
(Def.Ex. HH.)
The minutes of the Board meeting on January 7, 1999, report a request that the Board hold an executive session on February 4 to, inter alia, discuss legal matters and the hiring, firing, promotion, and discipline of personnel. (Pl.Ex. 25) Smith testified in his deposition that he perceived a clear consensus on the Board at the February 4 meeting not to rehire Plaintiff. (Smith Dep. I at 49-50, 54-56, 73, 86; Smith Dep. II at 22, 64, 74-75, 147.) Lenz also remembers this consensus. (Lenz Aff. ¶ 6.) The consensus was reportedly expressed after Smith reported to the Board about the possible impact of a settlement in the desegregation case and about a current study of the music department. (Id.) Smith also talked about beginning the instrumental band program at the sixth grade rather than the fifth grade. (Id.) The Board minutes of the February 4 meeting do not reflect this mandate.[6] (Pl. Ex. 24.) Indeed, the minutes do not include any reference to Plaintiff. (Id.) She was first mentioned in the Board minutes of the April 13 meeting. (Pl.Ex. 31.) In an executive session, the Board voted on various motions to approve teaching contracts. (Id.) The Board unanimously voted, inter alia, against a motion to approve a teaching contract for 11 teachers, including Plaintiff and Michelene Hallett.[7] (Id.) Two Board members, Marla Dell and Larry McIntosh, each aver that they were unaware of Plaintiff's breast cancer or treatment thereof until December 1999. (Dell Aff. ¶ 8; McIntosh ¶¶ 7, 8.) Plaintiff testified in her deposition that she knew of no one who told the Board members prior to April 13 of her cancer or treatment. (Pl. Dep. at 103-04.)
Also at the April 13 meeting, after the conclusion of the executive session, three new members of the Board were seated. (Id.) A proposal to reorganize the beginning band program at the District was discussed. (Id.) The recommendation was that band instrument instruction begin in sixth grade, rather than in fifth grade as it currently did, and that it be offered daily and not twice a week as it was then. (Pl.Ex. 29.) If these two changes were made, (1) the teachers would not lose time driving between the elementary and middle schools and in setting up the instruments because the band classes would be taught in classrooms devoted to band instruction and (2) the students would (a) have 1,641 additional minutes of instruction, (b) receive daily reinforcement and practice, and (c) find it easier to play an instrument because their mouth muscles were further developed. (Id.) It was explained *956 at the meeting that the recommended changes resulted from a year-long study of the Music Department and were being made prior to the conclusion of that study[8] as they affected the scheduling of the upcoming school year and of summer school. (Pl.Ex. 31.) The changes were approved. (Id.) The written report of the study was presented to the Board at its May 1999 meeting.[9] (Pl.Ex. 66.)
Plaintiff was offered a job by both the Ladue school district and the Parkway school district. (Pl. Dep. at 130-31.) She accepted the job at Parkway because it paid more. (Id. at 131.) Indeed, the Parkway job paid more than her Lindbergh job. (Id. at 131-32; Undisputed Facts ¶ 68.) Her change in jobs did not result in a loss of insurance coverage. (Undisputed Facts ¶ 72, 73.) She is happy with her job at Parkway. (Treiber Dep. at 210.)
In June, Defendant advertised twelve vacant positions, including one for "District Orchestra Teacher, Strings: Cello & Bass." (Pl.Ex. 58.) David Hall was hired. (Smith Dep. at 92.) He was certified in August 1999 to teach instrumental music in grades kindergarten through twelfth. (Pl.Ex. 62.) He had graduated in July 1999 from the University of Missouri at Columbia with a cumulative grade point average of 2.969 and had studio instruction in string bass and cello. (Id.) He consistently received "A's" in his instrumental ensemble classes. (Id.) The reason given for why Hall was considered more qualified for the reorganized position than Plaintiff was that he was a low strings specialist. (Smith Dep. II at 46-47, 50, 55, 114-15.) A low strings instrument is a bass or cello. (Treiber Dep. at 36.) Plaintiff testified in her deposition that she had seldom played both instruments prior to her employment with Defendant. (Id. at 37.) Smith testified that Hall was not hired to replace Plaintiff but was hired to teach strings. (Smith Dep. at 46.)
During the 1999-2000 school year, a brass specialist, Brian Wyss, was hired to replace a non-tenured teacher who resigned that year; and the next school year another specialist, a percussion specialist, was hired. (Lenz ¶ 19.)
As noted above, Plaintiff was told before February 4 that she had breast cancer and soon thereafter underwent a lumpectomy. Plaintiff met with an oncologist, Joanne Mortimer, M.D., on February 22 to discuss chemotherapy. (Def.Ex. Q.) Plaintiff would typically receive a chemotherapy treatment on a Thursday or Friday and return to work the following Monday. (Undisputed Facts ¶ 50.) On June 28, Dr. Mortimer reported that Plaintiff was doing well after her first cycle of chemotherapy. (Def.Ex. RR.) "She has multiple small complaints[,]" including awakening occasionally with sweating. (Id.) After Plaintiff's next cycle of chemotherapy, Dr. Mortimer reported that Plaintiff was again doing well, "overall." (Def.Ex. SS.) She had, however, "significant problems with headaches and blurry vision." (Id.) Prior to Plaintiff's third and fourth cycle of chemotherapy, Dr. Mortimer examined her and reported her doing well each time. (Def. Exs. TT and UU.) Prior to the fourth, and last, cycle on August 31, 1999, Plaintiff's only new complaint was of problems with her toenails. (Def.Ex. UU.) The chemotherapy caused Plaintiff's hair to fall out. (Treiber Dep. at 225.) Her hair came out during spring *957 break, however, so when school resumed she started wearing a wig. (Id.)
Plaintiff received 33 days of radiation treatment, beginning in August or September 1999. (Pl. Undisputed Facts ¶ 70.) Dr. Moley examined Plaintiff on August 30 and noted, "She looks pale but says she is riding her bike more and mowing her lawn and is not having any problems. On exam she looks well." (Def.Ex. VV.) Dr. Moley examined Plaintiff again after her radiation therapy concluded. (Def.Ex. WW.) She was reported to be doing well. (Id.) Two weeks later, on November 29, Dr. Mortimer examined Plaintiff. (Def. Ex. XX.) She also reported that Plaintiff was doing well. (Id.) Plaintiff's hair had regrown, and she had "no new complaints." (Id.) Plaintiff did complain, however, of numbness in her feet. (Id.) She was without any evidence of the breast cancer. (Id.)
On year after her lumpectomy, Plaintiff was still doing well. (Def.Ex. YY.) Although her hair was coming in, she continued to wear a wig. (Id.) Dr. Mortimer also concluded that Plaintiff was doing well one year after her lumpectomy. (Def.Ex. ZZ.) Her complaints of numbness in her feet had decreased. (Id.)
Plaintiff testified in her deposition that the physical residuals of her cancer and its treatment were a loss of the full range of motion in her left arm. (Pl. Dep. at 233.) She is right-handed. Her left arm gets tired if she does yard work and swells up. (Id.) She cannot wear her watch on that arm. (Id.) She is going through menopause. (Id. at 241.)
When asked in an interrogatory if any of her major life activities had been affected by her breast cancer, Plaintiff explained as follows.
As a result of my breast cancer and the hospitalization and other treatment received as a result thereof, including surgery, chemotherapy and radiation therapy, I have a record of impairment, all of which Lindbergh was fully aware of, and/or I was regarded as having such an impairment. Furthermore, because of the breast cancer and the treatment received as a result thereof, my major life activities of engaging in sexual relations and of having children are impaired, or I am perceived or regarded as having such impairments, because of societal attitudes toward breast cancer and that a woman's breasts are considered an integral part of a woman's sexuality. Finally, I do not have complete range of motion of my left arm.
(Inter.Ans.11.) When asked during her deposition about marriage and having children, Plaintiff replied that she had thought about both but had decided to pursue a career in music that did not allow for either. (Treiber Dep. at 226.) She would not wear a swimming suit or a tank top because of the scars from her lumpectomy. (Id. at 227.)
When asked during her deposition if there was anything Defendant did from the time she was first diagnosed with breast cancer until the end of the school year, other than not giving her a contract for the 1999/2000 school, that she felt discriminated against her because of her breast cancer or her treatment for breast cancer, Plaintiff replied, "They didn't give me a contract and they didn't give me tenure." (Id. at 107.) That was all.[10] (Id.) No one ever told her that she was not going to be offered a contract because of her cancer or her treatment for cancer. *958 (Id. at 109.) Nor did anyone ever promised her tenure. (Treiber Dep. at 44.)
Defendant seeks summary judgment on Plaintiff's ADA claims, arguing (1) the decision makers had no knowledge of Plaintiff's breast cancer when they decided not to renew her teaching contract; (2) Plaintiff is not a person with a disability; and (3) the decision makers had a legitimate, non-discriminatory reason for not renewing her contract. Plaintiff argues to the contrary.

Discussion
The parties' respective memorandum accurately set forth the standard of review for motions for summary judgment, including the application of such standard in employment discrimination cases. Accordingly, the standard will not be repeated here.
To establish an ADA claim, Plaintiff must show that she was disabled, qualified to perform the job, with or without a reasonable accommodation, and suffered an adverse employment action because of her disability. Moysis v. DTG Datanet, 278 F.3d 819, 824 (8th Cir.2002); Kellogg v. Union Pacific RR Co., 233 F.3d 1083, 1086 (8th Cir.2000). If Plaintiff makes this showing, a rebuttable presumption of discrimination emerges and Defendant must articulate a legitimate, nondiscriminatory reason for the adverse employment action. Id. If Defendant rebuts the presumption, Plaintiff must the demonstrate that the proffered nondiscriminatory reason was pretextual. Id. "Disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [the] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).
(A) An Impairment. "The Equal Employment Opportunity Commission (EEOC) has issued regulations defining the three elements of disability contained in subsection A." Otting v. J.C. Penney Co., 223 F.3d 704, 708 (8th Cir. 2000). "`Physical or mental impairment' is defined as `[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine.'" Id. (quoting 29 C.F.R. § 1630.2(h)(1)). Plaintiff's breast cancer is, therefore, an impairment. See Ellison v. Software Spectrum, Inc., 85 F.3d 187, 190 (5th Cir.1996) (finding it "undisputed" that plaintiff's breast was impairment under § 1630.2(h)(1)). See also Bragdon v. Abbott, 524 U.S. 624, 633, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (noting that cancer is included in a representative list[11] of disorders and conditions that are physical impairments). "Merely having an impairment[, however,] does not make one disabled for purposes of the ADA." Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 122 S.Ct. 681, 690, 151 L.Ed.2d 615 (2002). Claimants also need to demonstrate that the impairment substantially limits a major life activity. Id. See also EEOC v. R.J. Gallagher Co., 181 F.3d 645, 655 (5th Cir.1999) (considering a cancer diagnosis to be insufficient alone to establish a disabling impairment).
"`Major Life Activities' are defined as `functions such as caring for oneself, *959 performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" Otting, 223 F.3d at 708-09 (quoting § 1230.2(i)). A major life activity includes caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, working, sitting, standing, lifting, and reaching. Webner v. Titan Distribution, Inc., 267 F.3d 828, 834 (8th Cir.2001). Reproduction is also a major life activity. Bragdon, 524 U.S. at 638, 118 S.Ct. 2196. And, for purposes of the instant motion, the Court will assume that sexual relations are a major life activity. See Contreras v. Suncast Corp., 237 F.3d 756, 764 (7th Cir.2001) (noting that the Circuit had not held that sexual relations are a major life activity but assuming for purposes of instant case that they were); Runnebaum v. Nations-Bank, 123 F.3d 156, 170-71 (4th Cir.1997) (en banc) (same). See also McAlindin v. County of San Diego, 192 F.3d 1226, 1234 (9th Cir.1999) (holding that Bragdon compelled a conclusion that engaging in sexual relations is a major life activity).
"According to the EEOC regulations, `substantially limit[ed]' means `[u]nable to perform a major life activity that the average person in the general population can perform'; or `[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.'" Toyota Motor Mfg., Ky., 122 S.Ct. at 690 (quoting 29 C.F.R. § 1630.2(j) (2001) (alterations in original)). See also Otting, 223 F.3d at 709 ("`Substantially limits' means an individual is `[u]nable to perform [, ...] or [is s]ignificantly restricted as to the condition, manner or duration under which [he] ... can perform[,] a major life activity ... which the average person in the general population can perform ...'") (quoting § 1630.2(j)(1)) (alterations in original). "In determining whether an individual is substantially limited in a major life activity, the regulations instruct that the following factors should be considered: `[t]he nature and severity of impairment[;][t]he duration or expected duration of the impairment[;] and [t]he permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment.'" Toyota Motor Mfg., Ky., 122 S.Ct. at 690 (quoting §§ 1630.2(j)(2)(i)(iii) (alterations in original)). See also Otting, 223 F.3d at 711 (also citing § 1630.2(j)). Moreover, the ADA "addresses substantial limitations on major life activities, not utter inabilities." Bragdon, 524 U.S. at 641, 118 S.Ct. 2196.
In Toyota Motor Mfg., the Supreme Court addressed the question of "what a plaintiff must demonstrate to establish a substantial limitation in the specific major life activity of performing manual tasks." 122 S.Ct. at 691. After analyzing the terms "substantial" and "major," the Court held "that to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long-term." Id. Moreover, "[i]t is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those `claiming the Act's protection ... to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience ... is substantial.'" Toyota Motor Mfg., 122 S.Ct. at 691-92 (quoting Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 567, 119 S.Ct. 2162, 144 *960 L.Ed.2d 518 (1999)) (first alteration added; remaining alterations supplied). This definition "makes clear that Congress intended the existence of a disability to be determined in such a case-by-case manner." Id. at 692, 119 S.Ct. 2162. "An individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person." Id. See also Moysis, 278 F.3d at 825 ("Because disability is determined on a case-by-case basis, a court must ask whether the particular impairment constitutes for the particular person a significant barrier to employment." (interim quotations; alterations omitted)).
In the instant case, in support of her argument that her cancer substantially limited major life activities Plaintiff argues (a) the cancer has limited her ability to marry and have children; (b) the chemotherapy and radiation treatments caused harmful side effects; she now has a limited range of movement in her left arm; and (d) societal judgments about women who have had breast cancer.
Reproduction and sexual relations are major life activities; however, Plaintiff has submitted only her conclusory allegations in support of her argument that both were affected by her deposition. She has not introduced any medical evidence that her cancer or treatment thereof has affected her ability to have sexual relations, cf. Keller v. Board of Educ. of the City of Albuquerque, 182 F.Supp.2d 1148, 1155 (D.N.M.2001) (finding that breast cancer survivor had disabling impairment based on her unrefutted testimony that prescription medication she was taking to prevent a recurrence caused vaginal dryness that made sexual intercourse painful and resulted in a loss of desire for intercourse), or to have children, cf. Berk v. Bates Advertising USA, Inc., 25 F.Supp.2d 265, (S.D.N.Y.1998) (finding that breast cancer survivor had established substantial limitation of major life activity based on testimony by plaintiff that her treating physicians had told her that her particular type of breast cancer would put her at risk if she became pregnant and who then had undergone cancer-related surgical procedures which "put an end to any possibility of natural childbirth"). On the other hand, Plaintiff has explained her not marrying or having children as career choices.
Plaintiff also alleges she is disabled because of the side effects from the chemotherapy and radiation treatments. There is no evidence, however, that any side effects were other than temporary other than a limited range of motion in her left arm and a slight swelling in that arm. See Madjlessi v. Macy's West, Inc., 993 F.Supp. 736, 741 (N.D.Ca.1997) (finding that employee being treated for breast cancer did not establish genuine issue of material fact about whether she had a disabling impairment; employee worked as usual except for four days in each of the six months of chemotherapy treatment). And, the limited range of motion in her left arm has caused no substantial limitation. See Ellison, 85 F.3d at 187 (awarding summary judgment to former employer of woman who had been terminated as part of reduction in force and rejecting woman's ADA claim based on, inter alia, (a) her physician's deposition testimony that cancer can cause death if not treated and causes emotional distress from fear that cancer will return and (b) woman's affidavit detailing nausea, fatigue, swelling, inflammation, and pain caused by radiation treatment); Gordon v. E.L. Hamm & Assoc., 100 F.3d 907, 912 (11th Cir.1996) (directing district court to enter judgment for former employer of man who had suffered side effects from chemotherapy treatment for malignant lymphoma; chemotherapy treatments had been given every three weeks for a total of seven treatments and *961 side effects had lasted for approximately three days thereafter); Schwertfager v. City of Boynton Beach, 42 F.Supp.2d 1347, 1359-60 (S.D.Fla.1999) (finding that plaintiff who had been diagnosed with breast cancer and had undergone mastectomy, reconstructive surgery, and chemotherapy and who had urged that she was able to perform her job responsibilities had established only impairments of five-month duration, not any substantially limiting impairment of significant duration). But cf. Demarah v. Texaco Group, Inc., 88 F.Supp.2d 1150, 1155 (D.Colo.2000) (finding that plaintiff who had double mastectomy, chemotherapy, and reconstructive surgery during complained-of events and whose breast cancer was currently in remission had established genuine issue of material fact whether she had disabling impairment based on evidence that, at the relevant times, she could only walk short distances, could not care for herself, had to be taken care of by her mother, and could not take care of her youngest son, who then went to live with her ex-husband); Harrison v. Marsh, 691 F.Supp. 1223, 1229-30 (W.D.Mo.1988) (finding that plaintiff who had undergone radical mastectomy that resulted in removal of muscle from her arm, who was consequently unable to type for prolonged periods of time, and who was subsequently assigned to a position that required 70% of work time be spent doing such typing established that she had an impairment under the Rehabilitation Act).
Rather than evidence that her cancer and its treatment caused substantial limitations, Plaintiff has introduced evidence to the contrary. She returned to work after approved leave for surgery, scheduled her chemotherapy treatments so that her recovery time would primarily fall on the weekends, and underwent radiation therapy in the summer. There is no testimony that the cancer or treatment adversely affected her ability to perform her teaching duties. See Demming v. Housing and Redevelopment Auth. of Duluth, Minn., 66 F.3d 950, 954 (8th Cir.1995) (affirming grant of summary judgment in action brought under Rehabilitation Act, see note 11, supra, by woman who had been hospitalized for thyroid cancer; woman had failed to show that cancer had prevented her from performing her duties on a daily basis or that employer had failed to accommodate her condition).
Additionally, although Plaintiff testified about her concerns that her cancer might return, "[t]he mere fact that [P]laintiff's cancer may recur or might require further surgery does not make the condition substantially limiting." Alderdice v. American Health Holding, Inc., 118 F.Supp.2d 856, 864 (S.D.Ohio 2000) (finding as a matter of law that plaintiff, who had been treated for breast and cervical cancer, had not established that either "temporary condition" was substantially limiting under factors delineated in § 1630.2(j)(2)); Madjlessi, 993 F.Supp. at 741 (finding that fact that breast cancer may return was too speculative to constitute a residual effect and did not render plaintiff substantially limited during period relevant to litigation).
For the foregoing reasons, the Court finds that, based on the required individual inquiry, Plaintiff's breast cancer was not a disabling impairment.
(B) Record of Impairment. Plaintiff may also establish a violation of the ADA if she had a record of a disabling impairment.
"Has a record of such impairment means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k). Being hospitalized, in and of itself, is insufficient of establish a record of *962 impairment. See Demming, 66 F.3d at 955; Schwertfager, 42 F.Supp.2d at 1360. Plaintiff has introduced no evidence that there is anything in her personnel file that to indicate that she had a disabling impairment, see id., or that she otherwise has a history of or a misclassification as having a disabling impairment.
(C) Perception of Impairment. If Plaintiff was perceived by Defendant as having a disabling impairment, she has established an ADA violation. To do so, "[Plaintiff] would have to show that [Defendant] mistakenly believed that she had a physical impairment that substantially limited one or more major life activities, or [Defendant] mistakenly believed that she had an actual, nonlimiting impairment which substantially limited one or more major life activities." Brunko v. Mercy Hosp., 260 F.3d 939, 942 (8th Cir.2001). Plaintiff could also show that she is "regarded as having such an impairment" as defined in (C) if she "[h]as a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such an impairment[.]" 29 C.F.R. § 1630.2(l)(2).
"The provision addressing perceived disabilities `is intended to combat the effects of "archaic attitudes," erroneous perceptions, and myths that work to the disadvantage of persons with or regarded as having disabilities.'" Brunko, 260 F.3d at 942 (quoting Wooten v. Farmland Foods, 58 F.3d 382, 385 (8th Cir. 1995)). Thus, "[t]he focus is on the impairment's effect upon the attitude of others." Wooten, 58 F.3d at 385. "An employer's knowledge of an employee's disability, without more, is not sufficient to establish a `regarded as' claim." Kellogg, 233 F.3d at 1089. And, "[g]eneralized statements do not support the conclusion that management misperceives a person as being substantially limited in a major life activity." Keller, 182 F.Supp.2d at 1156. See also Cooper v. Olin Corp., 246 F.3d 1083, 1090 (8th Cir.2001) (finding that plaintiff had failed to show that she was perceived as having disabling impairment based, in part, on employer's physician's testimony that he considered work restrictions to be temporary); Ross v. Matthews Employment, No. 00 C 1420, 2000 WL 1644584 at *4 (N.D.Ill.2000) (finding that only evidence offered in support of perception argument  supervisor's comment that it was good plaintiff was not president because she had cancer  established only that defendant did not believe plaintiff could perform job and was insufficient to preclude grant of summary judgment to defendant); Pikoris v. Mount Sinai Med. Ctr., No. 96 CIV. 1403, 2000 WL 702987 (S.D.N.Y.2000) (finding that plaintiff who had been diagnosed with and treated for breast cancer had not established that she was perceived as having disabling impairment based on supervisor's two comments expressing concern that plaintiff could not handle stress of cancer).
In the instant case, Plaintiff points to no comments at all reflecting any negative perception of her cancer or of her as a cancer patient. She told Smith of her cancer on March 4, but the record lacks any comments by him about her illness and also lacks any indication anyone else in a supervisory position was informed of such prior the April 13 vote. See Gordon, 100 F.3d at 914 (finding that man treated for lymphoma was not regarded as having impairment, noting, in part, that man never indicated to anyone at his former employer, before or after his diagnosis of cancer, that he was unable to perform the work assigned him or unable to care for himself and had never spoken with anyone at employer about any difficulties he was having in completing any tasks); Ellison, 85 F.3d at 192-93 (finding supervisor's callous remarks  e.g., directing employees *963 who had to evacuate building following a power outrage to follow the "glowing" plaintiff, who had just received a radiation treatment  to be "beneath contempt" but not to be sufficient to create a material issue of fact on whether plaintiff was "regarded as" having a disabling impairment); Alderdice, 118 F.Supp.2d at 865 (rejecting "perceived as" argument by plaintiff diagnosed with breast and cervical cancer who testified that she was able to perform job and who had been accommodated by defendant/employer by being permitted to come to work late during radiation treatments); Malewski v. NationsBank of Fla., N.A., 978 F.Supp. 1095, 1101 (S.D.Fla. 1997) (rejecting plaintiff's argument that supervisor who had told her to "leave it at home" perceived her to be disabled; supervisor testified in deposition that remark was occasioned by plaintiff's negative attitude and that plaintiff consistently demonstrated the physical and mental ability to perform the essential elements of her job). Cf. Keller, 182 F.Supp.2d at 1156 (finding that plaintiff who was in remission for breast cancer had established prima facie case that she was regarded as having disabling impairment based on supervisor's changed behavior on learning of her diagnosis and on his references to women he had known who had died of breast cancer); McMunn v. Memorial Sloan-Kettering Cancer Ctr., No. 97 CIV.5857, 2000 WL 1341398 (S.D.N.Y.2000) (finding that woman who had been diagnosed with breast cancer and undergone radical mastectomy and chemotherapy prior to being employed by defendant and who had told her supervising physician of cancer three years later when asking him to review her medical records, assess her condition, and recommend appropriate treatment, and who had then been told that she was being fired because she would require too much time away from office had established a prima facie case of being regarded as having a disabling impairment).
Additionally, Plaintiff's conclusory reporting of societal attitudes is insufficient to create a material issue of fact.[12]See Johnson v. Ohio Valley Elec. Corp., No. 2:00-CV-283, 2002 WL 484418 at *7 (S.D.Ohio March 26, 2002) (rejecting as conclusory speculation, unsupported by any evidence, by breast cancer survivor that she was denied sought-after position because employer thought she would not be able to keep up with job or thought she would cost employer time off).
In support of her claim that she was perceived as having a substantially limiting physical impairment after her diagnosis of breast cancer, Plaintiff argues only that it must be so because the adverse employment action occurred after she was diagnosed with breast cancer. Such an allegation is speculation insufficient to create a material issue of fact. See Herring v. Canada Life Assurance Co., 207 F.3d 1026, 1030 (8th Cir.2000) ("Allegations do not rise to an issue of material fact." (interim quotations omitted)). See also Miller v. Solem, 728 F.2d 1020, 1024 (8th Cir.1984) (conclusive assertions of ultimate fact are entitled to little weight when determining *964 whether a non-movant has shown a genuine issue of fact sufficient to overcome a summary judgment motion properly supported by depositions or affidavits); Madjlessi, 993 F.Supp. at 742-43 (rejecting as mere speculation plaintiff's claim that she was not hired after present employer was purchased by other company because manager at company knew she had breast cancer).

Conclusion
The question before the Court is not one of compassion for Plaintiff's situation or of admiration for her being able to work during her cancer treatment. See Jane Byeff Korn, Cancer and the ADA; Rethinking Disability, 74 S.Cal.L.Rev. 399, 414, (2001) (noting that actual membership in the protected class is only an issue in ADA cases and advocating that cancer, with a focus on breast cancer, should be considered a per se disabling impairment given the cancer survivor's unique status and situation, including, inter alia, being able to continue working). Rather, the question is whether Plaintiff has established a genuine issue of material fact whether she has a disabling impairment as defined by the ADA. The Court finds, for the reasons set forth above, that she does not.[13] Accordingly,
IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment is GRANTED. [Doc. 20]
NOTES
[1] The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).
[2] Dr. Moley is listed under a caption "Surgical Oncology/Endocrinology" in a yellow page advertisement for the Division of General Surgery at Washington University School of Medicine. (Pl.Ex. 11.)
[3] Plaintiff's subsequent requests for sick leave were also approved. See Defendant's Exhibits Z, BB, FF, II, LL, and PP.
[4] The parties dispute the reason why Plaintiff joined the teachers' union after her surgery and after seven semesters of teaching at the District. This dispute and their dispute about when Plaintiff first contacted social worker at the hospital to discuss her employment situation are not relevant to a disposition of the pending motion.
[5] Smith testified, without contradiction, that his notes on Plaintiff's interview form were written on or before her interview. (Smith Dep. I at 27.)
[6] Plaintiff testified in her deposition that she did not know of the Board discussion on February 4 about the reorganization of her music department. She does not proffer any evidence that it did not occur.
[7] The Board also voted to authorize the administration to re-employ three of the eleven teachers if the enrollment increased or if the staffing needs warranted additional staff in the areas in which those three teachers were certified.
[8] The impetus for the study was the retirement of the long-serving Director of Music for the District. (Def.Ex. G.) The study was done by Dr. Doug Turpin. (Id.; Lenz Aff. ¶ 4.)
[9] The written report of the study did include this recommendation. See Plaintiff's Exhibit 37.
[10] See also Treiber Dep. at 202-04, 256 (repeating that factual basis for ADA claim was that her teaching contract was not renewed after she told Smith that she had cancer and chemotherapy).
[11] This list was generated pursuant to the Rehabilitation Act. Bragdon, 524 U.S. at 633, 118 S.Ct. 2196. The regulations generated pursuant to that Act have been held to be applicable to the ADA. Id.; Wooten v. Farmland Foods, 58 F.3d 382, 385 n. 2 (8th Cir. 1995).
[12] The Court notes that the district court in Cornman v. N.P. Dodge Mgt. Co., 43 F.Supp.2d 1066, 1072 (D.Minn.1999), found societal attitudes to be probative in an ADA claim brought by a woman who had been diagnosed with breast cancer and who had undergone a mastectomy 16 years before being fired. "This society clearly considers a woman's breasts to be an integral part of her sexuality, the loss of which would necessarily involve some significant impact on her sexual self-image." Id. Insofar as the Cornman holding may be construed to be require a finding of a disabling impairment as a matter of law in breast cancer patients who have undergone mastectomies, such a holding would contradict the requirement that ADA claims be evaluated on a case-by-case basis. And, in the instant case, Plaintiff did not undergo a mastectomy.
[13] Because the Court finds that Plaintiff has not established that she has a disabling impairment, the Court declines to reach the question whether Defendant's proffered reason for the nonrenewal of her contract was a pretext for discrimination.