Godron v. Hillsborough Cty. et al.    CV-97-592-B    03/21/00

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**James Godron**

    **v.**                                  Civil No. 97-CV-592-B
                                         Opinion No. 2000 DNH 077
**Hillsborough County, et al.**


**MEMORANDUM AND ORDER**


James Godron sued Hillsborough County, the County's Department of Corrections, and Superintendent of Corrections, James O'Mara, alleging that they refused to provide a reasonable accommodation for his disability in violation of the Americans With Disabilities Act (the "ADA"). Godron also asserts several related causes of action based on state law. Defendants have moved for summary judgment. For the reasons that follow, I grant defendants' motion with respect to Godron's ADA claim and decline to exercise supplemental jurisdiction over his state law causes of action.

## I.

Godron was diagnosed with prostate cancer in August 1996. See Aff. of James Godron ¶ 5. At the time, he was employed as a correctional officer at the Hillsborough County Department of Corrections.[1] See id. ¶ 2.

After taking time off to receive treatment, Godron informed his supervisor in April 1997 that his cancer was in remission and he was ready to return to work. He asked to be assigned to the weekend shift because he recently had been accepted as a full-time student at Franklin Pierce Law School. See Defs.' Mot. for J. on the Pleadings as to Counts One and Three, and for Summ. J. as to Count Two Ex. A (Godron Dep. Test. at 47-49); id. Ex. I (Godron Letter to EEOC Aug. 8, 1997) (explaining that on April 7, 1997, he requested assignment to weekend shift to be able to attend law school). Godron's supervisor rejected Godron's request, however, and instead assigned him to the third shift.

---

[1] I describe the evidence in the record in the light most favorable to Godron using the familiar summary judgment standard. See, e.g., National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995).

<u>See</u> <u>id.</u> Ex. F (Cusson Mem. to Godron Apr. 14, 1997).

Godron, believing that it would hinder his recovery, objected to working the third shift. To support his claim, he submitted a letter from one of his physicians on April 18, 1997. His doctor opined that Godron's

> clinical course has been excellent and he maintains a superb outlook on his future and life. At the present time he is certainly fit to perform his duties and I have cleared him to go back to work but he will continue to recover from his surgery and his situation will continue to improve for up to the next year. He tells me he is now being confronted with having to go back to the third shift with the attendant physical stress this poses to him. I think that this would be extremely unwise for him as he is recovering from his cancer and will be deemed at some risk for recurrence. . . .
>
> It would be my medical recommendation that Jim's work schedule permit him to work during daytime hours as this will allow him to get adequate rest, reduce both the physical and emotional stress that occurs with him having to change shifts and alternate his sleep or wake cycle every week.

Id. Ex. G (Green Letter to O'Mara Apr. 18, 1997). Godron's supervisor nevertheless again rejected Godron's request for reassignment. In an April 25, 1997 memorandum explaining his

-5-

decision, the supervisor noted that Godron's physician had determined that he could return to work and stated that "it is the Department's and my position, that all staff members must be able to perform the duties of their job classification irrespective of their assigned shift." Id. Ex. F (Cusson Mem. to Godron Apr. 25, 1997). Additional letters from Godron's physicians stating that he should not work the third shift did not prompt the supervisor to change his position. Accordingly, on June 30, 1997, Godron filed a complaint with the Equal Opportunity Employment Commission ("EEOC") challenging the County's failure to assign him to the weekend shift.[2]

On August 4, 1997, Godron submitted a request for a medial leave of absence for the period from August 12, 1997 to September 12, 1997. See id. Ex. F (Godron Medical Leave of Absence Request Aug. 4, 1997). The County approved Godron's request on August 7, 1997. See id. Ex. F (O'Mara Letter to Godron, Aug. 7, 1997). The same day, the County wrote to the EEOC, expressing its

_____

[2] The EEOC dismissed Godron's complaint on October 29, 1997 because it determined that he was not "disabled."

-6-

willingness to assign Godron temporarily to the day shift in an effort to accommodate his medical condition.  See id. Ex. I (Kirby letter to EEOC Aug. 7, 1997); id. Ex. I (Godron Letter to

EEOC Aug. 8, 1997) (indicating he received Kirby's Aug. 7, 1997 letter).

When Godron's medical leave expired, he applied for a personal leave of absence until December 12, 1997. See id. Ex. F (Godron Personal Leave of Absence Request Sept. 12, 1997). In a subsequent memorandum, he explained he needed an additional leave of absence to

> seek an interim resolution that would encompass both [his] need to work during third shift hours and [his] school schedule. The necessity for [him] to make this accommodation for school results directly from the County's arbitrary and capricious refusal to reassign [his] work hours in consideration with [his] advanced educational requirements, and the County's own past practice.

Id. Ex. F (Godron Mem. to Street Sept. 17, 1997). The County granted Godron a 30-day personal leave of absence but thereafter required him to return to work. See id. Ex. F (O'Mara Letter to Godron Sept. 23, 1997).

Godron did not report to work when his leave of absence expired. On November 6, 1997, the County sent him a letter stating that he must report to work within seven days. See id.

-8-

Ex. F (O'Mara Letter to Godron Nov. 6, 1997). The County also informed Godron that if he failed to report to work, the County would treat his decision as "a voluntary termination consistent with the terms of [his] Personal Leave of Absence that end [sic] on 12 October 1997." Id. On December 12, 1997, the County notified Godron that it deemed his failure to report to work to be a voluntary termination of his employment. See id. Ex. F (O'Mara Letter to Godron Dec. 12, 1997).

## II.

Even if I assume that Godron has a "disability" within the meaning of the ADA,[3] he is not entitled to relief under the Act

_____

[3] The ADA states that "[t]he term 'disability' means with respect to an individual - (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. 12102(2) (1994). Godron does not specify which of the three alternative definitions of disability applies in his case. Because he argues that he requires an accommodation for his condition, however, he presumably is claiming that he presently suffers from an actual impairment that substantially limits one or more of his major life activities. While I do not reach the issue, I have significant doubt as to whether the record would support a conclusion that Godron's cancer, which is in remission,

because he rejected defendants' reasonable proposal to accommodate his disability by temporarily assigning him to the day shift.  The medical evidence Godron cites to support his claim establishes that he could work during the daytime hours without accommodation.  Thus, the County's proposal to assign Godron to the first shift was a reasonable accommodation for his medical condition.  Godron rejected the County's proposal, not because of his disability, but because he could not work the day shift while attending law school.  An employee may not maintain an ADA claim if he rejects a reasonable accommodation proposed by his employer in an effort to obtain an alternative accommodation

---

currently impairs any of his major life activities.  Cancer is not a per se disability under the ADA.  See Hirsch v. National Mall & Serv., Inc., 989 F. Supp. 977, 982 (N.D. Ill. 1997). Moreover, the only activity that Godron claims he cannot perform because of his condition is the ability to work the third shift. While the ability to work at all can qualify as a major life activity, the ability to work the third shift plainly is not. See 29 C.F.R. § 1630.2(j)(3)(i) (1999) (finding that working is "substantially limited" only if an individual is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes . . ."); see also Tardie v. Rehabilitation Hosp. of Rhode Island, 168 F.3d 538, 542 (1st Cir. 1999) (finding that inability to work more than 40 hours per week did not substantially limit major life activity of working).

that better suits his non-work-related interests.  See Smith v. Midland Brake, Inc., 180 F.3d 1154, 1177 (10th Cir. 1999) (en banc) (identifying limits on scope of employer's duty to reassign employee as means of providing reasonable accommodation); Gile v.

United Airlines, Inc., 95 F.3d 492, 498 (7th Cir. 1996) ("An employer is not obligated to provide an employee with the accommodation he requests or prefers, the employer need only provide some reasonable accommodation."); Hankins v. The Gap, Inc., 84 F.3d 797, 800-01 (6th Cir. 1996) ("[An] employee cannot make his employer provide specific accommodation if another reasonable accommodation is instead provided."). Accordingly, Godron is not entitled to relief under the ADA.

## III.

I grant the defendants' motion for summary judgment with respect to Godron's ADA claim. I also decline to exercise supplemental jurisdiction over Godron's state law claims. Accordingly, Godron's state law claims are dismissed without prejudice.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

March 21, 2000

cc: Paul Monzione, Esq.
    Carolyn Kirby, Esq.
    Mark Broth, Esq.