Pimental v. Dartmouth-Hitchcock      CV-01-292-M    12/30/02
UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Mary Ann Pimental,
      Plaintiff

      v.                                    Civil No. 01-292-M
                                            Opinion No. 2002 DNH 221
Dartmouth-Hitchcock Clinic,
      Defendant


**O R D E R**


Mary Ann Pimental brings this action against her former employer, Dartmouth-Hitchcock Clinic ("DHC"), seeking damages for alleged violations of the Americans with Disabilities Act, 42 U.S.C. § 12101, et. seq.  She also advances state law claims for breach of contract and wrongful termination, over which she says the court should exercise supplemental jurisdiction.  DHC denies any wrongdoing and moves for summary judgment as to all of plaintiff's claims.  Plaintiff objects.[1]

---

[1]    Parenthetically, the court notes that plaintiff has exhausted her administrative remedies by filing a charge of discrimination with the EEOC.  After conducting an investigation, the EEOC notified her that it was "unable to conclude that the information obtained establishes violations of the statutes," and informed her of her right to sue.  Exhibit 1-G to plaintiff's memorandum (document no. 25).

## Standard of Review

When ruling on a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Intern'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Center, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

If, however, the non-moving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to a material fact has been proved, and "summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted). As the Court of Appeals for the First Circuit has observed, "the evidence illustrating the

factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial. Conclusory allegations, improbable inferences, and unsupported speculation will not suffice." Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997) (citations and internal quotation marks omitted).

## Background

Viewed in the light most favorable to plaintiff, the material facts are as follows. Plaintiff is a licensed registered nurse who began working at DHC in 1992 in various non-salaried, part-time positions, for between 20 and 24 hours each week. In April of 1997, she applied for, but did not receive, a position as the "Operations Manager for Nurse First." In May, however, she was promoted to the core management team of the Nurse First Program. At that point, she was made a salaried, exempt employee, with the expectation that she would work a 35 hour week.

3

In September of 1998, plaintiff was diagnosed with stage III breast cancer. As a consequence, she was given approximately eight months of medical leave, during which time she underwent a modified radical mastectomy, radiation treatment, and chemotherapy (subsequently, she also underwent reconstructive surgery). She does not deny that DHC afforded her all the medical leave she requested under the Family Medical Leave Act or that she was provided with all disability pay to which she was entitled.

While plaintiff was on leave, the Nurse First management team was reorganized and two of the management positions, including hers, were eliminated. Shortly before returning to work, plaintiff expressed an interest in securing a position as a staff nurse in the Nashua Pediatrics Department. But, although the position entailed 40 hours of work per week, plaintiff said she wanted to work only 35 (or 32, depending upon whether one credits her deposition testimony or her EEOC charge of discrimination). Plaintiff did not get the job, and she claims that the woman who did was less qualified than she for the

4

position and further claims that DHC refused to hire her because of her cancer.[2]

In June of 1999, plaintiff was offered a position as a staff nurse in the Nurse First Program, a job that required 35 hours per week. It appears that she declined that offer and, shortly thereafter, inquired about a staff nursing position in the Nashua Urgent Care center - a position that called for only 20 hours of work per week. Notwithstanding that fact, plaintiff proposed working for 24 hours per week in that position and combining it with an additional 6 hours per week of quality assurance work. Her goal was to fashion a job that provided at least 30 hours of work per week, thereby making her eligible for "H3" status and greater benefits. DHC, however, declined that proposal, saying the department was not budgeted for an "H3" position and all it

---

[2] At her deposition, plaintiff testified that, notwithstanding the fact that DHC was "leaning towards a 40-hour workweek" for the vacant position, she told DHC that she was "only committed to 35 hours a week." Pimental deposition, day 2 at 7. Nevertheless, three or four days after making those comments, plaintiff says she attempted to contact her interviewer to say she was "planning to take the position." Id. at 8. But, she was unable to reach her interviewer that day and, when she finally was able to speak with her, plaintiff learned that the position had already been offered to another person - someone willing to work 40 hours per week.

5

needed was someone to work 20 hours per week. Although disappointed, plaintiff appears to have accepted the position as originally offered. She does, however, seem to suggest that DHC's rejection of her efforts to combine various positions to obtain "H3" status constitutes a failure to reasonably accommodate her claimed disability. See Plaintiff's memorandum at 6.

Shortly thereafter, plaintiff interviewed for the West Center Manager of the Nashua Division of DHC. DHC did not hire her for that position, claiming that the woman who was eventually hired was simply more qualified than plaintiff.

Finally, in September of 1999, plaintiff expressed interest in an Urgent Care position in Manchester, but was soon told that DHC was not going to fill the position at that time. As part of her (implicit) evidence of unlawful discrimination, plaintiff says she saw that very position advertised in the newspaper approximately two months later. DHC suggests that the decision to fill the position in December, rather than September, was purely financial; in December, its budget permitted it to fill

that vacant position, albeit for only 30 hours per week, rather than the 36 hours per week originally contemplated. Plaintiff, on the other hand, suspects she was not given the position when she originally inquired about it because DHC harbored some discriminatory animus against her based upon her cancer. See Pimental deposition, day 2 at 107 ("I don't see any other reason whey they would have not hired me for the position.").[3]

In October of 1999, plaintiff applied for, and obtained, a full-time position as a school nurse in the Londonderry School District. She began working there in early November, while remaining in her position at DHC. In December of 1999, however, she notified DHC that she was resigning, effective January 1, 2000. She did, however, remain as a per diem employee, apparently making herself available to DHC when its need for additional nursing staff coincided with her availability (though it is unclear whether she ever actually worked on a per diem basis after her resignation).

---

[3] Although DHC publically advertised for the vacant position in December - prior to plaintiff's resignation - she never applied for (nor, necessarily, was she ever interviewed for) that position.

DHC contends that it declined to hire plaintiff for the various positions she sought because other, better qualified applicants were hired instead, or because plaintiff sought hours and/or benefits above those for which the particular department was presently budgeted. It categorically denies that plaintiff's cancer played any role in its hiring decisions. Plaintiff, on the other hand, says DHC's refusal to hire her for those positions was motivated by a discriminatory animus, based upon her cancer.

**Discussion**

Title I of the ADA prohibits employers from discriminating against qualified individuals with disabilities. To establish a prima facie case of disability discrimination under the ADA, plaintiff must show that: during the time frame relevant to this suit, she suffered from a disability, as that term is used in the ADA; she was able to perform the essential functions of her job, either with or without reasonable accommodation; and she suffered an adverse employment action because of her disability. See,

e.g., Lebron-Torres v. Whitehall Labs., 251 F.3d 236, 239 (1st Cir. 2001).[4]

The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).  Plaintiff asserts that she is a qualified individual with a disability under each of these three definitions.  DHC disagrees.

I.    Plaintiff's Impairment and Section 12102(2)(A).

In determining whether an employee falls within the scope of section 12102(2)(A), courts apply a three-part test.

> First, we consider whether [the plaintiff's] condition
> constitutes a mental or physical "impairment."  Second,
> we identify the life activities upon which [the

_____

[4]     As is the case in most employment discrimination suits, absent direct evidence of discriminatory animus on the part of the employer, the court employs the familiar McDonnell-Douglas burden shifting paradigm with regard to most claims brought under the ADA.  An exception to that general rule applies when an ADA plaintiff advances a "failure to accommodate" claim, in which case the principles articulated in McDonnell-Douglas do not apply.  See generally Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999).

9

> plaintiff] relies to determine whether they constitute "major life activities." Major life activities are only those that are "of central importance to daily life." Third, we must determine whether the impairment substantially limits the major life activity identified. To be substantially limiting, the impairment's impact must be permanent or long-term.

Bailey v. Georgia-Pacific Corp., 306 F.3d 1162, 1167 (1st Cir. 2002) (citations omitted). See also Bragdon v. Abbott, 524 U.S. 624, 631 (1998).

There is no question that plaintiff's breast cancer constitutes an "impairment" for purposes of the ADA. See 29 C.F.R. § 1630.2(h). See also Ellison v. Software Spectrum, Inc., 85 F.3d 187, 190 (5th Cir. 1996) (holding that the plaintiff's breast cancer was an impairment under the ADA); Treiber v. Lindbergh School Dist., 199 F. Supp. 2d 949, 958 (E.D. Mo. 2002) (same). But, although plaintiff's cancer qualifies as an impairment, it does not necessarily follow that she is also "disabled" within the meaning of the ADA. See Bailey, 306 F.3d at 1167. See also Godron v. Hillsborough County, 2000 WL 1459054 *2, n.3, 2000 DNH 77 (D.N.H. March 21, 2000) ("Cancer is not a per se disability under the ADA"). Thus, the more difficult question presented in this case is whether, during the time

10

period relevant to her ADA claims, plaintiff's breast cancer substantially limited one or more of her major life activities.

In attempting to demonstrate that an impairment substantially limits a major life activity, it is not enough for a plaintiff to simply submit evidence of a medical diagnosis of an impairment. See Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 195 (2002) ("Merely having an impairment does not make one disabled for purposes of the ADA. Claimants also need to demonstrate that the impairment limits a major life activity."). Consequently, the Supreme Court has held that, "the ADA requires those claiming the Act's protection to prove a disability by offering evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial." Id. at 198 (citations, internal quotation marks, and internal punctuation omitted). See also 29 C.F.R. pt. 1630, App. § 1630.2(j) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual. . . . The determination of whether an individual is substantially limited in a major life

11

activity must be made on a case by case basis.").  In other words, determining whether a plaintiff has a disability under the ADA involves an "individualized inquiry."  <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471, 483 (1999).

In construing the scope and proper application of the ADA, the Supreme Court has concluded that the phrases "substantially limits" and "major life activity" must be "interpreted strictly to create a demanding standard for qualifying as disabled."  <u>Williams</u>, 534 U.S. at 197.  The Court has also held that "to be substantially limited in performing manual tasks, an individual must have an impairment that <u>prevents or severely restricts</u> the individual from doing activities that are of <u>central importance</u> to most people's daily lives.  The impairment's impact must also be permanent or long-term."  <u>Id.</u> at 198 (emphasis supplied).  In short, to demonstrate that he or she falls within the scope of the ADA, an individual bears a substantial burden of proof.  <u>See, e.g.</u>, <u>Whitney v. Greenberg, Rosenblatt, Kull & Bitsoli, P.C.</u>, 258 F.3d 30, 33 (1st Cir. 2001) (holding that to prevail, the plaintiff must establish that her impairment "was profound enough

and of sufficient duration . . . to hamper her ability" to engage in one or more major life activities).

In support of her claim that, during the time period relevant to this litigation, her cancer (and the various side-effects of the surgical and medical treatments she received) substantially affected one or more major life activities, plaintiff says her:

> disability [a]ffected practically all major life functions. The cancer [a]ffected [plaintiff's] ability to care for herself, sleep, to concentrate. In essence it affected all her major life functions. The cancer also [a]ffected [her] ability to reproduce and have sexual activity. The treatment forced [plaintiff] into early menopause and interfered with her relations with her husband. [Plaintiff] was forced to take chemotherapy and [several medications]. Many of these medicines pose a positive risk to a fetus if taken during pregnancy. The Court has found that "reproduction and sexual dynamics surrounding it are central to the life process itself" and that the ability to reproduce and bear children constitutes a major life activity.

Plaintiff's memorandum at 11-12 (citations omitted) (emphasis supplied).

Turning to the evidence adduced by plaintiff in support of those claims - her deposition testimony and her affidavit - the court is compelled to conclude that she has failed to demonstrate that her breast cancer had a substantial limiting effect on her ability to care for herself, sleep, or concentrate. See Pimental deposition, day 2, at 138-53; Pimental affidavit at paras. 3 and 7. While that testimony plainly reveals the terrible effect the cancer had upon her, it also discloses that during the period relevant to this litigation, the most substantial side-effects were (relatively speaking) short-lived. That is to say, they did not have a substantial and lasting effect on the major activities of her daily life. See, e.g., Pimental deposition, day 2, at 140-41 (stating that her concentration was not impaired to the point that it prevented her from doing her job); 145 (stating that prescription medications reduced her hot flashes and helped her sleep); 148 (stating that her memory problems did not affect her ability to do her job and she was able to accommodate her periodic forgetfulness); 148 (stating that she no longer suffers from radiation burns); 149-51 (stating that while she still has some difficulty reaching high above her head and carrying heavy objects, she was able to perform a range of household chores);

14

152 (stating that she no longer experiences shortness of breath); 152-53 (in response to a question asking whether concentration problems had a "significant impact" on her life, saying they had "some impact").

Moreover, plaintiff's own assertions that the cancer did not substantially impair her ability to perform various tasks associated with her employment tend to undermine her claim that it did substantially affect her ability to, for example, care for herself on a long-term basis. See, e.g., Plaintiff's memorandum at 12 (stating that plaintiff "does not claim that her major life activity of working has been substantially compromised"); id. at 4 (stating that, upon her return from medical leave, plaintiff "had no problems performing her duties as a nurse"). Thus, she has failed to demonstrate that her illness substantially affected her ability to care for herself, sleep, or to concentrate on a permanent or long-term basis.

Finally, plaintiff says the chemotherapy she received essentially precluded her from conceiving a child (because of the risk posed to the fetus by such treatment) and, ultimately,

15

caused her to undergo premature menopause. Thus, she says it adversely (and permanently) affected her ability to reproduce. The Supreme Court has held that the ability to reproduce is a "major life activity." See Bragdon, 524 U.S. at 638 ("Reproduction falls well within the phrase 'major life activity.' Reproduction and the sexual dynamics surrounding it are central to the life process itself."). Thus, says plaintiff, on that ground alone she is plainly "disabled" within the meaning of section 12102(A).

There is little doubt that had plaintiff become pregnant during her chemotherapy treatment, the fetus might well have been placed at substantial risk. Nor is there any doubt that, to the extent the chemotherapy caused her to undergo premature menopause, it adversely affected her ability to bear more children. Importantly, however, plaintiff points to nothing in the record that suggests she intended to have more children. And, because assessing an individual's disability under the ADA requires an "individualized inquiry," it is not enough to simply say that she can no longer have children. Instead, plaintiff must point to something that suggests she at least contemplated

16

having more children.  Chief Justice Rehnquist addressed this issue in his separate opinion in Bragdon, writing:

> According to the Court, the next question is 'whether reproduction is a major life activity."  That, however, is only half of the relevant question.  As mentioned above, the ADA's definition of a "disability" requires that the major life activity at issue be one "of such individual."  The Court truncates the question, perhaps because there is not a shred of record evidence indicating that, prior to becoming infected with HIV, respondent's major life activities included reproduction (assuming for the moment that reproduction is a major life activity at all). . . . There is absolutely no evidence that, absent the HIV, respondent would have had or was even considering having children.

Bragdon, 524 U.S. at 658-59 (Rehnquist, C.J., concurring in part and dissenting in part).  See also Treiber, 199 F. Supp. 2d at 960 (concluding that while plaintiff's breast cancer was certainly an impairment, she failed to demonstrate that it substantially affected a major life activity; although chemotherapy affected her ability to have children, plaintiff did not assert any interest in having children and, therefore, that side-effect of her treatment did not render her disabled under the ADA).

17

So it is in this case.  While the record reveals that plaintiff has two children (ages nine and eleven), there is simply no evidence that, prior to being diagnosed with cancer, she had considered having more.[5]  She has likewise failed to point to sufficient evidence in the record to support the conclusion that her cancer had a permanent or long-lasting and substantial effect on her intimate relations with her husband.  See Pimental deposition, day 2 at 153 (stating that while she remains self-conscious, her intimate relationship with her husband has, following her reconstructive surgery, changed for the better:  "It's improved.  I don't know if it will ever be the same as it was prior to my diagnosis, but it's definitely improved since I had reconstruction.").

In light of the record evidence upon which plaintiff relies in her memorandum, she has failed to make a prima facie showing that she was, during the period relevant to her claims against DHC, "disabled" under section 12102(A).  See Gillen v. Fallon

_____

[5]    At the final pretrial conference held on December 20, 2002, the court discussed this shortcoming in the evidence upon which plaintiff relies.  Through counsel, plaintiff candidly acknowledged that she could not, in good faith, make the required representation regarding reproductive intent.

18

Ambulance Service, Inc., 283 F.3d 11, 24 (1st Cir. 2002) ("A plaintiff must proffer evidence from which a reasonable inference can be drawn that a major life activity is substantially or materially limited.") (quoting Snow v. Ridgeview Medical Center, 128 F.3d 1201, 1207 (8th Cir. 1997)) (internal punctuation omitted).

II. Plaintiff Lacks a "Record of Such an Impairment."

In support of her asserted entitlement to the protections afforded by the ADA by virtue of section 12102(2)(B), plaintiff says:

> It is undisputed that [plaintiff] has a record of breast cancer. [Plaintiff] received her treatment for cancer at the Defendant's facility. It is undisputed that the Defendant was aware that [plaintiff] had taken leave of absence due to her breast cancer. The defendant provided her with Family Medical Leave Act time off for her cancer and provided her disability benefits. . . .
>
> [Plaintiff] had claimed protection of the ADA under the auspices of having a record of an impairment. As there is undisputed evidence of a "record" of impairment and the Defendant has failed to address this claim in its motion for summary judgment[,] [t]his claim should be allowed to proceed to a jury.

Plaintiff's memorandum at 14. While it is true that plaintiff has a demonstrated "record" of an impairment - her breast cancer - that, standing alone, is insufficient to entitle her to the protections afforded by the ADA. As the Act itself provides, to qualify as "disabled" under section 12102(2)(B), an individual must demonstrate that he or she has a "record of <u>such an impairment</u>." That is to say, a record of an impairment that "substantially limits one or more of the major life activities of such individual." And, as noted above, plaintiff's evidence on that point is legally insufficient to deflect summary judgment. <u>See</u> <u>Santiago Clemente v. Executive Airlines</u>, 7 F. Supp. 2d 114, 118 (D.P.R. 1998) ("While her employer's awareness might be enough to establish a record of her <u>condition</u>, it does not, by any means, establish a record of <u>disability</u>. Again, evidence of impairment alone is not enough to establish disability.").

III. <u>Plaintiff was not "Regarded as Having Such an Impairment."</u>

Finally, plaintiff asserts that she is entitled to the protections afforded by the ADA because DHC <u>regarded</u> her as disabled - that is, suffering from an impairment that substantially limited one or more major life activities. <u>See</u> 42

20

U.S.C. § 12102(2)(C).  See also 29 C.F.R. § 1630.2(l).  As the

Supreme Court has observed,

> [t]here are two apparent ways in which individuals may
> fall within this statutory definition: (1) a covered
> entity mistakenly believes that a person has a physical
> impairment that substantially limits one or more major
> life activities, or (2) a covered entity mistakenly
> believes that an actual, nonlimiting impairment
> substantially limits one or more major life activities.
> In both cases, it is necessary that a covered entity
> entertain misperceptions about the individual - it must
> believe either that one has a substantially limiting
> impairment that one does not have or that one has a
> substantially limiting impairment when, in fact, the
> impairment is not so limiting.

Sutton, 527 U.S. at 489.

Here, plaintiff seems to suggest that the major life

activity that DHC mistakenly believed was substantially limited

by her cancer was her ability to work.[6]  In support of that

claim, plaintiff says:

---

[6]    The Supreme Court has yet to decide whether working
constitutes a major life activity under the ADA.  See Williams,
534 U.S. 193; Sutton, 527 U.S. at 492.  For purposes of
addressing defendant's motion for summary judgment, however, the
court will assume that working is a major life activity.  See,
e.g., Gelabert-Ladenheim v. American Airlines, Inc., 252 F.3d 54,
58 (1st Cir. 2001) (assuming, arguendo, that working is a "major
life activity"); Carroll v. Xerox Corp., 294 F.3d 231, 239 n.7
(1st Cir. 2002) (same).  See generally 29 C.F.R. § 1630.2(j)(3)
(suggesting that working is a "major life activity").

21

> The Defendant regarded Ms. Pimental to be disabled as
> of October 10, 1998.  Diane Dwyer, Southern New
> Hampshire Region HR Manager placed her on disability
> leave.  The undisputed comments regarding the "stress"
> of Ms. Pimental's illness also demonstrates [sic] the
> fact that the Defendant regarded Ms. Pimental as
> disabled.  They [sic] felt she could not handle the
> "stress" of management with her disability.  Upon her
> application for a job as a staff nurse in the West
> Center Pediatrics it is undisputed that the
> interviewer, Ms. Thomas, made inquiries regarding her
> disability.  Pre-employment inquiries are prohibited
> under the ADA.

Plaintiff's memorandum at 14-15 (citations omitted).

First, plaintiff has a somewhat mistaken view of the extent to which employers may make "pre-employment inquiries" into candidates' disabilities.  The regulation upon which she relies provides that, generally speaking, employers may not ask whether an individual suffers from a disability or inquire into the nature or severity of that disability.  See 29 C.F.R. § 1630.13(a).  Importantly, however, the next section of the Code of Federal Regulations, which plaintiff overlooks, specifically authorizes employers to "make pre-employment inquiries into the ability of an applicant to perform job-related functions, and/or [to] ask an applicant to describe or to demonstrate how, with or

22

without accommodation, the applicant will be able to perform job-related functions."  29 C.F.R. § 1630.14.

In support of her view that DHC violated section 1630.13, the sole evidence identified by plaintiff is page 19 of her deposition, see plaintiff's memorandum at 15, where, in response to a question about why she thought she was denied a job because of her impairment, she testified:

> Well, Jan asked me where I was in my treatment, and I told her I was going to have to go for further treatment, radiation treatments for four to six weeks after my return to work.  I told her I would try to schedule that around department needs.

Pimental deposition, day 2 at 19.  Nothing about that isolated question posed by the interviewer suggests that it was made in violation of section 1630.13.  First, DHC was well aware that plaintiff had been diagnosed with cancer; in fact, it had given her substantial medical leave in order to obtain treatment - treatment she received at DHC.  Thus, there was no need for DHC to violate section 1630.13 by making "inquiries as to whether [plaintiff] is an individual with a disability."

23

Moreover, plaintiff's response to the question reveals that she interpreted it as an inquiry into whether she would require any further accommodations in order to perform the tasks associated with the position she sought (e.g., additional medical leave time) - a line of inquiry permitted by section 1630.14. In short, plaintiff has pointed to insufficient evidence to support even the inference that DHC violated the provisions of section 1630.13 during the course of that particular interview.

Next, plaintiff says evidence that DHC regarded her as disabled can be found in comments made by DHC employees concerning her stress. In support of that assertion, plaintiff again points to her deposition. Overlooking potential hearsay and admissibility issues for the moment, plaintiff testified that two DHC employees told her they had heard that other DHC employees did not believe she was the right person for a particular managerial job since she was experiencing so much stress dealing with her cancer. Pimental deposition, day 1 at 64 and 71. Again, however, that isolated, anecdotal evidence is insufficient to sustain her burden of showing that DHC regarded

24

her as substantially limited in her ability to work.  As the Court of Appeals for the Second Circuit has noted:

> "substantially limited" in the ability to work means that a plaintiff is significantly restricted in the ability to perform either a class of jobs or a broad range of jobs.  An impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one.
>
> Thus, in order to prove that [defendant] perceived her as substantially limited in her ability to work, [plaintiff] bore the burden of presenting evidence that [defendant] perceived her to be incapable of working in a broad range of jobs suitable for a person of her age, experience, and training because of her disability.

Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 872 (2d Cir. 1998) (citations and internal punctuation omitted).  See also Carroll v. Xerox Corp., 294 F.3d 231, 240 (1st Cir. 2002) (same) Sinkler v. Midwest Property Mngt. Ltd. Pshp., 209 F.3d 678, 686 (7th Cir. 2000) (same); Tardie v. Rehab. Hosp. of Rhode Island, 168 F.3d 538, 542 (1st Cir. 1999) (same); Ellison, 85 F.3d at 192 (same).  See generally 29 C.F.R. § 1630.2(j)(3).

Even viewing the evidence upon which plaintiff relies in the light most favorable to her, a reasonable, properly instructed trier of fact could not conclude that DHC regarded her as

25

incapable of performing a wide range of jobs for which she was trained. See, e.g., Doyal v. Oklahoma Heart, Inc., 213 F.3d 492, 499 (10th Cir. 2000) (holding that "isolated comments" that plaintiff was "incapacitated" and that her "difficulties at work were not a fixable problem" were insufficient to "support the conclusion that management misperceived her as being substantially limited in learning, sleeping, thinking, or interacting with others."); Ellison, 85 F.3d at 192-93 (holding that notwithstanding the fact that supervisor made comments about plaintiff's breast cancer that were insensitive, crass, and "beneath contempt," they were insufficient to support her claim that her employer "regarded her" as disabled by reason of her illness); Pikoris v. Mount Sinai Medical Center, 2000 WL 702987 *13 (S.D.N.Y. May 30, 2000) (holding that employer's comments indicating that, given plaintiff's recent treatment for breast cancer, it believed her position as an anesthesiology resident was too stressful for her were insufficient to support conclusion that employer perceived her as generally unable to work because of her illness). In fact, it is undisputed that the three DHC employees plaintiff listed on her resume as references provided her with strong recommendations for the position with the

26

Londonderry School District that plaintiff ultimately secured. See, e.g., Pimental Deposition, day 2 at 79. Those strong recommendations certainly suggest that DHC did not consider plaintiff unable to perform a wide range of jobs for which she was qualified. See, e.g., Ryan, 135 F.3d at 871 (holding that statement to plaintiff that "this job is too stressful for you because you have colitis" did not, in light of employer's having given her strong employment recommendations, support conclusion that employer misperceived her as being disabled).

In light of the sparse evidence of record upon which plaintiff relies, she has failed to carry her burden of demonstrating that DHC regard her as disabled under section 12102(2)(C). At most, plaintiff has demonstrated that DHC regarded her as suffering from an impairment that did not substantially limit one or more of her major life activities. See Tardie, 168 F.3d at 542.

## Conclusion

There is no question that plaintiff's cancer has dramatically affected her life, and that the associated

27

impairment has been real and extraordinarily difficult for her and her family. The narrow issue before the court, however, is whether, during the time period at issue, her cancer rendered her "disabled," as that term is used in the ADA. Based upon the record presented, the court is compelled to conclude that plaintiff has not, and cannot, point to sufficient evidence to support a claim of disability under the ADA, given that term's statutory meaning. Consequently, as to plaintiff's claims under the ADA, the defendant, DHC, is entitled to judgment as a matter of law.

As to plaintiff's state law claims, which, among other things, raise difficult state law questions involving statutory preemption of common law causes of action and whether N.H. Rev. Stat. Ann. 275:49 provides a private right of action, the court declines to exercise its supplemental jurisdiction. See generally Camelio v. American Federation, 137 F.3d 666 (1st Cir. 1998). See also Dennis v. Husqvarna Forrest & Garden Co., 1994 WL 759187 at *7 (D.N.H. Dec. 27, 1994) ("[T]his court is and should be hesitant to blaze new, previously uncharted state-law trails. Expansive reading of New Hampshire statutes and

recognition of novel causes of action under those statutes is a realm best occupied by the New Hampshire Supreme Court."). Because plaintiff's state law claims are best pursued in a state court of competent jurisdiction, this court will not resolve them in this case.

Defendant's motion for summary judgment (document no. 19) is granted in part. Defendant is entitled to judgment as a matter of law with regard to counts 1, 2, and 3 of plaintiff's amended complaint. As to the remaining counts (4 and 5), which advance state law claims, the court declines to exercise its supplemental jurisdiction and they are dismissed without prejudice to pursuing them in state court. Defendant's motion to exclude plaintiff's expert testimony (document no. 12) is denied as moot. The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

December 30, 2002

cc: John S. Krupski, Esq.
    Emily G. Rice, Esq.

29